# United States Court of Appeals
## For the First Circuit

———————

No. 03-1823

EMILY MCINTYRE, as Administrator of the Estate of John L. McIntyre; CHRISTOPHER MCINTYRE, as Co-administrator of the Estate of John L. McIntyre,

Plaintiffs, Appellants,

v.

UNITED STATES OF AMERICA,

Defendant, Appellee,

H. PAUL RICO; JOHN MORRIS; JOHN J. CONNOLLY; RODERICK KENNEDY; ROBERT FITZPATRICK; JAMES RING; JAMES GREENLEAF; JAMES AHEARN; KEVIN J. WEEKS; JAMES J. BULGER; STEPHEN FLEMMI; JOHN DOES, Nos. 1-50,

Defendants.

———————

No. 03-1791

LAWRENCE A. WHEELER, Individually and as Special Administrator of the Estate of Roger M. Wheeler; PATRICIA J. WHEELER, Individually and as Special Administratrix of the Estate of Roger M. Wheeler; PAMELA (WHEELER) NORBERG; DAVID B. WHEELER; MARK K. WHEELER,

Plaintiffs, Appellants,

v.

UNITED STATES OF AMERICA,

Defendant, Appellee,

JOHN J. CONNOLLY, JR.; JOHN M. MORRIS; H. PAUL RICO; ROBERT FITZPATRICK; JAMES A. RING; JAMES GREENLEAF; JAMES AHEARN; JAMES J. BULGER, a/k/a Whitey; STEPHEN J. FLEMMI, a/k/a The Rifleman; JOHN V. MARTORANO; JOHN DOES, Nos. 1-50,

Defendants.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald G. Lindsay, U.S. District Judge]

---

Before

Lynch, Circuit Judge,
Cyr, Senior Circuit Judge,
and Howard, Circuit Judge.

---

William E. Christie, with whom Steven M. Gordon and Shaheen & Gordon, P.A. were on brief, for appellants Emily McIntyre and Christopher McIntyre.

Richard A. Olderman, Attorney, Appellate Staff, with whom Robert S. Greenspan, Attorney, Appellate Staff, Peter D. Keisler, Assistant Attorney General, and Michael J. Sullivan, United States Attorney, were on brief, for appellee United States in the McIntyre case.

Frank A. Libby, Jr., with whom Douglas S. Brooks and Kelly, Libby & Hoopes, P.C. were on brief, for appellants Lawrence A. Wheeler, Patricia J. Wheeler, Pamela (Wheeler) Norberg, David B. Wheeler, and Mark K. Wheeler.

Richard A. Olderman, Attorney, Appellate Staff, with whom Robert S. Greenspan, Attorney, Appellate Staff, Peter D. Keisler, Assistant Attorney General, Michael J. Sullivan, United States Attorney, and Jeffrey S. Bucholtz, Deputy Assistant Attorney General, were on brief, for appellee United States in the Wheeler case.

---

May 10, 2004

---

**LYNCH**, <u>Circuit Judge</u>.  These two cases involve claims against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 <u>et seq.</u>, arising out of alleged wrongful actions of FBI agents.

On September 15, 1999, a diligent federal trial judge sitting in an organized crime case issued a lengthy opinion outlining a possible pattern of corruption involving at least two FBI agents, John Connolly and his supervisor John Morris, and two notorious Boston criminals, James "Whitey" Bulger and Stephen "the Rifleman" Flemmi.  <u>See</u> <u>United States</u> v. <u>Salemme</u>, 91 F. Supp. 2d 141 (D. Mass. 1999).  Such corruption had been rumored but had been denied by the FBI.

The 1999 opinion by Judge Wolf revealed that Bulger and Flemmi, who were leaders of the Winter Hill Gang, a crime syndicate involved in murder, bribery, extortion, loansharking, and gambling operations, had been high-level FBI informants since the 1970s, aiding the agency in its investigation of La Cosa Nostra, a rival crime syndicate.  The opinion raised the prospect that Bulger and Flemmi had received numerous benefits from the FBI in return, including protection from prosecution, and at times, access to the names of informants who were themselves providing information to the FBI about the criminal activities of Bulger and Flemmi.  <u>Id.</u> at 148-63, 322.  Some of the informants may have been killed as a

result, and the murderous activities of Bulger and Flemmi covered up.  Id. at 208-13.

The opinion speculated that Agent Connolly may have disclosed to Bulger and Flemmi the identity of an individual, John McIntyre, who was an informant for the local Quincy police and was debriefed by the FBI, United States Customs Service, and the Drug Enforcement Administration (DEA).  Id. at 213-15.  McIntyre disappeared roughly six weeks after an October 17, 1984 interview with FBI Agent Roderick Kennedy, in which McIntyre had linked Bulger to gun-running and drug-smuggling operations.  Id.  His body was found fifteen years later, on January 14, 2000, in a makeshift grave near Boston.  But the opinion, published in September 1999, ultimately concluded that it could not be determined whether FBI Agent Kennedy had, in fact, shared this information about McIntyre with Connolly and whether Connolly, in turn, had told Bulger.  Id. at 214-15.  That was because, as the court said later, "important FBI documents concerning John McIntyre were . . . improperly withheld by agents of the Boston FBI until it was too late to question relevant witnesses concerning them."  United States v. Flemmi, 195 F. Supp. 2d 243, 249-50 (D. Mass. 2001).

The opinion also indicated the likelihood that Agent Connolly had disclosed to Bulger the name of another informant as to Bulger's crimes, Brian Halloran.  In January 1982, Halloran told two FBI agents that Bulger and Flemmi had caused the 1981 murder of

a Tulsa businessman, Roger Wheeler. Connolly learned of Halloran's cooperation and disclosed it to Bulger. Halloran was murdered in May 1982. Salemme, 91 F. Supp. 2d at 208-210. Agent Morris testified to this sequence of events in hearings before Judge Wolf in April 1998.

Agent Connolly was indicted on October 11, 2000 and charged with numerous crimes, including "alert[ing] Bulger and Flemmi to the identity of confidential law enforcement informants in order to protect Bulger's and Flemmi's ongoing criminal activities" and taking other steps to protect Bulger and Flemmi. Connolly was charged with inducing Agent Morris to do the same, in violation of Morris's legal obligations. Among the several racketeering acts charged was that Connolly had told Bulger and Flemmi of Halloran's statements that Bulger and Flemmi had caused Wheeler's murder. In turn, the indictment charged, Bulger caused Halloran to be murdered. Connolly was convicted, and his conviction was affirmed on appeal. United States v. Connolly, 341 F.3d 16 (1st Cir. 2003).

On May 25, 2000, the estate of John McIntyre, through its administrator (McIntyre's mother, Emily McIntyre) and co-administrator (McIntyre's brother, Christopher McIntyre), filed an administrative claim against the United States under the FTCA.[1] The essence of the theory behind the claim was that the FBI had (i)

---

[1]    We refer to the plaintiff in this case as McIntyre.

-4-

directly caused the death of John McIntyre, when Agent Connolly informed Bulger and Flemmi that McIntyre was cooperating with certain authorities investigating Bulger and Flemmi, thus signing McIntyre's death warrant, and (ii) indirectly caused McIntyre's death through the protection the FBI afforded Bulger and Flemmi, which encouraged and enabled them to commit murders, including that of McIntyre.[2] A second administrative complaint was filed on June 8, 2000.

On May 11, 2001, the estate of Roger Wheeler, the murdered Tulsa businessman, filed an administrative claim under the FTCA against the United States. The theory of the claim was that the FBI's illicit protection of Bulger and Flemmi had facilitated the murder of Roger Wheeler.[3] This legal theory differed from that articulated in the McIntyre case, as there was no direct relationship between the FBI and Wheeler.

---

[2] Specifically, the estate asserted legal theories of (a) conspiracy to protect Bulger and Flemmi from arrest and prosecution as a proximate cause of McIntyre's kidnaping, torture and execution in violation of McIntyre's First, Fourth, and Fifth Amendment rights; (b) violation of those same Fourth and Fifth Amendment rights, stated as claims under Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971); and (c) wrongful death, in violation of Mass. Gen. Laws ch. 229, §§ 2, 6.

[3] Both the Wheeler and McIntyre administrative claims also included claims that FBI agents had obstructed and impeded the investigation of the respective murders. But in their suits in federal court, both sets of plaintiffs raised cover-up claims only against individual FBI agents, not against the United States itself.

The United States failed to act on either claim within the required six-month period, thus giving both estates the option, which they took, of treating those claims as having been denied. See 28 U.S.C. § 2675(a). In due course, both filed suit against the United States as well as various FBI agents in the Boston office, Bulger, Flemmi, and other members of the Winter Hill Gang.

McIntyre's claims against the United States consisted of (1) three counts under Mass. Gen. Laws ch. 229, § 2 for civil conspiracy, negligence, and supervisory liability, causing McIntyre's death and (2) three counts under Mass. Gen. Laws ch. 229, § 6, corresponding to the three counts under § 2, for negligently causing McIntyre's conscious suffering while he was kidnapped, tortured and killed.

The claims of the Wheeler estate were joined by Roger Wheeler's widow and four of his five children, suing individually.[4] The Wheelers' claims against the United States sought to hold it directly and vicariously liable for (1) two counts of tortious conduct causing Wheeler's death under Mass. Gen. Laws ch. 229, § 2; (2) two counts of causing Roger Wheeler's conscious suffering the moments immediately before his murder under Mass. Gen. Laws ch. 229, § 6; and (3) one count of causing emotional distress to Wheeler and his family.

---

[4] We refer to the estate and individual plaintiffs in this case as the Wheelers.

The United States moved to dismiss in both suits on the ground that neither set of plaintiffs filed their administrative claims within the required two-year period from the accrual of the cause of action. See 28 U.S.C. § 2401(b). The district court agreed in both cases. McIntyre v. United States, 254 F. Supp. 2d 183, 193 (D. Mass. 2003); Wheeler v. United States, No. 02-10464-RCL (D. Mass. March 31, 2003). This consolidated appeal is from the dismissals of the FTCA claims against the United States and reviews the single issue, on two sets of facts, of when the claims "accrued" for FTCA purposes. To be timely, the McIntyre claims had to accrue on or after May 25, 1998, and the Wheeler claims on or after May 11, 1999.

**I.**

The following facts are presented in the light most favorable to the plaintiffs. See Muniz-Rivera v. United States, 326 F.3d 8, 11 (1st Cir. 2003). The facts are drawn from the two complaints and the materials submitted to the district court on the respective motions to dismiss. Gonzalez v. United States, 284 F.3d 281, 288 (1st Cir. 2002) (on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), the court may look to supplemental materials in addition to pleadings). We also draw on facts found in United States v. Salemme, supra.

-7-

**A.    Factual and Procedural Background Relevant to McIntyre**

In mid-October 1984, John McIntyre began cooperating with Richard Bergeron of the Quincy Police Department. Salemme, 91 F. Supp. 2d at 213. McIntyre told Bergeron that he was an engineer on a ship named the Valhalla that had been used in an unsuccessful attempt to deliver guns and ammunition from Massachusetts to the Irish Republican Army (IRA) in Ireland. He said that he worked for Joseph Murray, who secretly owned the Valhalla and was closely connected to Bulger, and that Bulger was involved in the attempted arms shipment through his associates Kevin Weeks and Patrick Nee. McIntyre also mentioned Flemmi. Id. Bergeron told Agent Roderick Kennedy, an FBI liaison officer, that McIntyre was cooperating and that McIntyre had linked Bulger and his associates to the Valhalla. Bergeron arranged for agents from the DEA and United States Customs Service, along with Agent Kennedy, to participate in McIntyre's debriefing. Kennedy and a Customs agent interviewed McIntyre on October 17, 1984. McIntyre told them that Bulger's associate Patrick Nee had traveled to Ireland to meet the Valhalla. Id. at 214. McIntyre also told them that Murray was partners in a separate drug smuggling operation with "an individual named Whitey who operates a liquor store in South Boston," whom Kennedy understood to be Bulger. Id. Around November 30, 1984, McIntyre disappeared.

Christopher McIntyre, John's brother, stated by affidavit that he and Emily McIntyre, John's mother, filed multiple missing persons reports with the Quincy police. Christopher said that the government told him on one occasion that the "mob" had murdered John, but later told him that John was "alive, a fugitive from justice and would be prosecuted if caught." Emily also stated by affidavit that she had made "repeated requests" to the government for information or help in finding her son but received none. Instead, she said, government agents told her that "John was a fugitive." In a 2000 Boston Herald interview, both Emily and Christopher said that they had suspected Bulger's hand in John's disappearance in 1984 but said nothing out of fear.

On April 15, 1986, although McIntyre was still missing, a grand jury indicted him along with Murray, Nee, and four others for their roles in the Valhalla operation and drug smuggling. Bulger and Flemmi were not named as defendants or otherwise mentioned in the indictment. The grand jury returned a superseding indictment on May 8, 1986, which again did not name Bulger or Flemmi as defendants. The court then issued a warrant for McIntyre's arrest. On September 6, 1995, a note appeared in the docket of the Valhalla prosecution: "Case reopened as to John Crawley, John McIntyre, Michael Nigro. NOTE: Case previously closed in error. Defendants Crawley, McIntyre and Nigro remain

fugitives." The case remained open until March 20, 2000, when McIntyre's death had been confirmed.

Meanwhile, on April 16, 1986, shortly after the first indictment, attorney John Loftus, acting on behalf of Emily, Chris, and Patricia McIntyre, John's sister, sent a letter to the Attorney General, United States Customs Service, DEA, State Department, and United States Attorney for the District of Massachusetts. The FBI was not one of the addressees on the letter. The letter, whose subject line was "Re: Wrongful Death of John L. McIntyre," alleged that John McIntyre was a government informant concerning IRA gun-running in Boston, that federal authorities leaked his informant status to the British government, and that the British government told the IRA, resulting in McIntyre's abduction and murder.

On June 2, 1986, Emily McIntyre asked the Veterans Administration (VA) to erect a headstone marker for her son at the Massachusetts National Cemetery.

On September 20, 1988, the Boston Globe ran a report describing Bulger as an FBI informant and raising the possibility that Bulger "has been able to exploit his cachet with the FBI" to evade investigation and apprehension by the state police and the DEA. The article suggested that the FBI may have tipped Bulger off to recording devices in his home and car and to the timing of sting operations. But it did not raise the possibility that the FBI leaked information to Bulger about informants in his own

-10-

organization or shielded him from prosecution for crimes like murder. Nor did the article mention McIntyre. The article reported that

> State Police officials . . . asked the FBI to conduct an internal inquiry. The FBI cleared two agents, and the FBI leadership remains outraged at the suggestion that any of its own would engage in that kind of treachery.
> James F. Ahearn, special agent in charge of the FBI in Boston, was unequivocal when asked last month if Bulger has had relations with the FBI that have left him free of its scrutiny.
> "That is absolutely untrue," said Ahearn. "We have not had evidence that would warrant it and if we do develop anything of an evidentiary nature, we will pursue it. We specifically deny that there has been special treatment of this individual." He declined to make any further comment on the matter and instructed Connolly not to speak on the subject.

In 1989, Emily McIntyre and Loftus published <u>Valhalla's Wake: The IRA, MI6, and the Assassination of a Young American</u> (Atlantic Monthly Press). In the book, they indicated awareness that John had ties to the IRA and the "Mob" and that he faced possible "Mob[] retribution" for his cooperation with the government. They stated that John's blue pickup truck had been spotted at Murray's place of business and that it was later found under a bridge with his uncashed VA check inside. But they ultimately theorized that British intelligence was responsible for John's murder. Based on the McIntyre family's own investigation into John's death, which involved interviews with "an IRA courier" and a "source" within British intelligence, the book speculated that British intelligence had its own mole in the Valhalla,

-11-

discovered from United States Customs agents that McIntyre was an informant on a related drug-smuggling operation, falsely told the IRA that McIntyre was an informant on the Valhalla operation to divert attention from the British mole, and then murdered McIntyre to prevent him from refuting the story.

In October 1991, Emily McIntyre applied to the VA for death benefits under her son's policy.

In the early to mid-1990s, the <u>Boston Globe</u> published a series of articles on McIntyre's disappearance. One of those articles, appearing on December 24, 1992, stated that Sean O'Callaghan, a former IRA operative, had tipped off the Irish police to the 1984 Valhalla shipment and that the IRA may have mistakenly suspected McIntyre of being the leak and murdered him. The story, which quoted Emily McIntyre, said that "[m]ost authorities believe McIntyre was done in by his associates, . . . most of whom were in the now-defunct Winter Hill Gang" headed by Bulger. The article noted that when Bulger heard that the Valhalla had been seized, he said, in a conversation secretly recorded by DEA bugs in his apartment, "That's our stuff," and that McIntyre was last seen with Patrick Nee, a Bulger associate. But the story made no connection between the FBI and McIntyre's death. In fact, in response to Emily McIntyre's theory that her son had been killed by British intelligence, the article noted that "federal investigators familiar with the Valhalla case say there is <u>no</u>

evidence that <u>McIntyre was fingered by any agent of the US</u>, Irish, or British governments" (emphasis added).

On January 29, 1995, a second article in the <u>Boston Globe</u> reported that "authorities in the United States" had called "ludicrous" any claim that "the US government negligently allowed [McIntyre] to be killed." The story indicated that government officials were not the only ones who might have known that McIntyre was an informant, stating that "[r]umors that [John] McIntyre was talking [to the federal government] were rampant" and citing Emily McIntyre as saying that Customs agents had "openly tailed [her son], and were parked outside her home the last night she saw her son."

Then, on December 11, 1996 and June 14, 1997, the <u>Boston Globe</u> published two more articles reporting that law enforcement officials believed McIntyre had been killed by the Winter Hill Gang. The December 11 article, which quoted Emily McIntyre, stated that "[f]ederal agents believe McIntyre was killed by Boston gangsters who suspected him of informing against them." The June 14 article was more specific. It theorized that Bulger had compromised the Valhalla operation, after taking a hefty profit from it, by tipping off the Central Intelligence Agency (CIA). Relying on witness statements and other evidence, the article suggested that, afterwards, Bulger and Flemmi nonetheless tortured McIntyre to find out what he had told authorities about the gun-

running and marijuana smuggling operations, and then killed him, disposing of his body at sea. Neither article made any mention of FBI involvement.

At around the time of the second article, in 1997, more details of the relationship between Bulger and Flemmi and their FBI handlers came to light through the prosecution of Flemmi in the case of United States v. Salemme, 91 F. Supp. 2d 141 (D. Mass. 1999). In Salemme, on January 10, 1995, a grand jury indicted Bulger and Flemmi, along with five others who were members of either La Cosa Nostra or the Winter Hill Gang, of RICO conspiracy and various other federal crimes. Id. at 301. Three more superseding indictments were obtained, with the last coming on July 2, 1996. Id. at 306. None of the indictments mentioned McIntyre's disappearance, although several referred to murders committed by Bulger and Flemmi.

In April 1997, in the process of addressing the defendants' motion to suppress some electronic surveillance evidence, Judge Wolf, who was presiding over the Salemme case, discovered earlier filings in the case before a magistrate judge that suggested that Bulger and Flemmi were FBI informants. Id. at 308. This information raised questions about, inter alia, whether the FBI had given Bulger and Flemmi immunity from prosecution for their ongoing criminal conduct.

In a June 6, 1997 order, over the FBI's objections, Judge Wolf revealed that the FBI had, in response to a court order, confirmed in a closed hearing that Bulger was an informant. United States v. Salemme, 978 F. Supp. 364, 365 (D. Mass. 1997). The order also revealed that Flemmi was an informant. Id. at 373. In a June 25, 1997 affidavit, Flemmi stated that Agent Morris had assured him that he and Bulger could be involved in any criminal activities short of murder and would be protected by the FBI. Salemme, 91 F. Supp. 2d at 310. Flemmi's affidavit was not sealed and an account of his statements was published the next day in the Boston Globe. Several months later, on September 3, 1997, Flemmi submitted under seal a motion to dismiss, claiming, inter alia, that the FBI had promised him immunity. Id. at 311. The motion was unsealed, over government objections, on September 10. Id.

Several months later, on December 5, 1997, the Boston Herald made public that the Department of Justice had conducted its own probe into Bulger and Flemmi's relationship with their handlers. The article reported that Judge Wolf had said at a hearing the previous day that the Office of Professional Responsibility had launched an internal probe and found "no evidence of continuing criminal conduct within the statute of limitations" by Agents Morris and Connolly. Some details of this investigation were later revealed in Judge Wolf's opinion in Salemme, issued on September 15, 1999:

-15-

> In late June 1997, the Attorney General established a task force of Department of Justice and FBI personnel to investigate the allegations of misconduct raised by Flemmi and the motions to suppress. That task force conducted its investigation in July and early August 1997, and issued a confidential report to the Attorney General. With the agreement of the government, the court reviewed the Executive Summary of that report and some of the documents that the investigation generated in order to decide certain issues concerning discovery . . . .

91 F. Supp. 2d at 310. Nothing in the record indicates that the underlying facts of the Office of Professional Responsibility investigation were otherwise made public at the time. But from our review of the docket in the Salemme case, it is clear that the government repeatedly sought, at around this time, to keep Flemmi's allegations of government misconduct and the government's response to them under seal.

Judge Wolf held a series of evidentiary hearings from January to October 1998 on the subject of Flemmi's claim of immunity. Id. at 312. These hearings were open to the public. Emily McIntyre attended part of a hearing on April 15, 1998. In an article the next day, the Boston Herald reported that at that hearing, Robert Stutman, the former local chief of the DEA, testified that "agents in his office 'swore' that the FBI compromised their Flemmi-Bulger probe to the point where the pair's bureau 'handler' was unwelcome at DEA's offices." Stutman admitted, however, that he had no proof of FBI wrongdoing and that he "d[id]n't know now" if "the FBI [had] burn[ed] us on [the]

-16-

investigation."  Nothing in the record indicates that Stutman ever mentioned McIntyre in his testimony.

On April 22, Morris testified, under a grant of immunity, that he had told Connolly in early 1982 that another FBI informant, Brian Halloran, had said that Bulger and Flemmi asked him to murder Roger Wheeler.  Id. at 209.  Morris testified that Connolly told him that he had passed the information on to Bulger and Flemmi.  Halloran was murdered shortly thereafter on May 11, 1982.  The Boston Herald ran a story on April 23 summarizing Morris's testimony.  As with Stutman, nothing indicates that Morris ever mentioned McIntyre in his testimony.

On May 20, 1998, another DEA agent, Albert G. Reilly, testified about the Valhalla.  The Boston Globe summarized Reilly's testimony the next day with the headline "DEA unable to link Bulger to IRA guns."  The story recounted that "authorities now believed that Bulger had tipped off authorities to the gun-smuggling operation and that he and Flemmi tortured a Quincy man, John McIntyre, who was suspected of cooperating with the authorities" (emphasis added).  The story did not say, however, that the FBI had tipped off Bulger as to McIntyre's identity as an informant.  The article also stated that Reilly had testified that he, like Stutman, believed the DEA's investigation of Bulger and Flemmi had been compromised by the FBI but had no way to prove it.

-17-

In early June 1998, after the May 25, 1998 critical date for accrual of the McIntyre claims had passed, Richard Bergeron of the Quincy Police Department testified about McIntyre's cooperation and disappearance. Id. at 213. As best we can tell, Bergeron's testimony was the first piece of evidence presented in the Salemme proceedings that provided direct information about McIntyre's disappearance. Bergeron testified that McIntyre was "petrified" of the people he was implicating and that McIntyre was not the type of potential witness whose cooperation could be publicly disclosed. Bergeron then said that he told FBI Agent Kennedy that McIntyre had implicated Bulger and his associates in the Valhalla operation. He testified that he had arranged for Kennedy and a Customs agent to interview McIntyre. Id. at 214. Kennedy had testified earlier, on April 14, 1998, that he and Connolly often exchanged information. Other evidence also indicated that Kennedy had participated in protecting Bulger and Flemmi from investigation on previous occasions. Id. But, because the government, apparently in violation of discovery orders, did not produce Kennedy's reports of his interview of McIntyre until after Kennedy had testified, Kennedy was never questioned about whether he had passed on the information about McIntyre to Connolly and, if so, whether Connolly had told Bulger and Flemmi. Kennedy was not recalled to the witness stand to provide this information. Id.

During Bergeron's cross-examination, the prosecution asked him what individuals, to his knowledge, knew that McIntyre was cooperating with authorities and might have passed on that information. When defense counsel objected, the prosecution stated that its line of questioning was in response to the implication that "it was the FBI who may have leaked this [information to Bulger and Flemmi] when there's literally a dozen people" other than the FBI who could have done so (emphasis added). The prosecution was explicit that the evidence was so speculative that the court "shouldn't infer that there was some leak from the FBI that led to Mr. McIntyre's disappearance" (emphasis added). The prosecution then went on to establish that, in addition to the FBI, the Quincy police, the Customs Service, and the DEA all knew of McIntyre's cooperation. The prosecution also established that McIntyre had spoken to authorities about a number of "notorious criminals," as well as the IRA, "[a]ll of whom would have had a motive to make him disappear."

Judge Wolf published a 260-page opinion in the Salemme case on September 15, 1999, well after the cut-off date for accrual of McIntyre's claims. As to McIntyre's disappearance, he concluded,

> [T]here is circumstantial evidence to suggest that Kennedy may have told Connolly about McIntyre's cooperation and claims and, in view [of] the Halloran matter, reason to be concerned that Connolly may have told Bulger and Flemmi. These issues cannot, however, be resolved on the present record.

-19-

<u>Id.</u> at 214-15.

McIntyre's body was recovered on January 14, 2000. Kevin Weeks, a Bulger associate, led law enforcement to McIntyre's makeshift grave. <u>Flemmi</u>, 195 F. Supp. 2d at 251 n.45.

On May 25, 2000, McIntyre's estate filed a notice of tort claim with the FBI.

On September 27, 2000, a grand jury returned a superseding indictment of Bulger and Flemmi that alleged that in October or November of 1984, Bulger and Flemmi learned that McIntyre was cooperating with the FBI and Customs Service regarding Bulger's involvement in both the Valhalla operation and the importation of marijuana by boat into Boston, and, as a result, kidnapped and murdered McIntyre. The indictment did not say how Bulger and Flemmi discovered McIntyre's cooperation. On October 11, 2000, Connolly was indicted for his role in various murders committed by Bulger and Flemmi, but not for any role in McIntyre's murder.

On March 8, 2001, McIntyre's estate filed suit in federal district court. McIntyre's claim was the first administrative claim and first federal action to be filed arising from the FBI's relationship with Bulger and Flemmi. On October 15, 2001, the United States moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) on the ground that McIntyre's estate had failed to present its

-20-

administrative claims within two years of accrual, as required by the FTCA, 28 U.S.C. § 2401(b).

On March 31, 2002, the district court granted the motion, finding that the claims had accrued before April 1998. The court reasoned that, prior to April 1998, the McIntyres clearly believed John McIntyre to be dead and had sufficient facts to support a reasonable inference that Bulger and Flemmi had killed him, based on local press reports that McIntyre was last seen with Nee, a Bulger associate, and that Bulger ran the Valhalla operation. The court also determined that the McIntyres had enough information to form the theory that "the FBI was at least negligent in [its] handling of Bulger and Flemmi." The court relied principally on (1) the FBI's acknowledgment in 1997 that Bulger and Flemmi were informants and (2) the April 15, 1998 hearing, attended in part by Emily McIntyre, in which DEA Agent Stutman testified about his suspicions that the FBI had compromised a DEA investigation of Bulger and Flemmi. Final judgment was entered on motion of McIntyre's estate. The estate timely appealed.

## B.    Factual and Procedural Background Relevant to Wheeler

Roger Wheeler, a Tulsa businessman, owned World Jai Alai (WJA), which operated facilities where spectators could bet on Jai Alai matches. Salemme, 91 F. Supp. 2d at 208. John Callahan, who had ties to the Winter Hill Gang, was president of WJA. Id. Wheeler suspected that Callahan was skimming money from WJA for

members of the Winter Hill Gang, including Bulger and Flemmi. Wheeler fired Callahan and began an audit of WJA's financial operations. Id. at 209. Before the audit was completed, on May 27, 1981, Wheeler was shot to death while sitting in his car in the parking lot of a Tulsa country club. Id. at 207-08.

The Wheeler murder remained unsolved for many years. In the spring of 1995, David and Lawrence Wheeler, two sons of Roger Wheeler, visited the FBI's office in Tulsa to deliver some of their father's records requested by the office. They stated that they were unhappy with the lack of progress in the investigation. According to David Wheeler's affidavit, FBI Agent Jack Hawkins replied, "[I]f we do that, we will have to go wherever the evidence might lead us . . . and you know, it might actually take us to some involvement on the part of your mother. Are you willing to see your mother go to jail?" David Wheeler interpreted this as a threat intended to deter future complaints about the FBI's lack of progress.

The Tulsa World and the Daily Oklahoman published at least twelve articles on Wheeler's murder between 1995 and 1999. At the time, Patricia (Wheeler's widow), Pamela (Wheeler's daughter), and Lawrence (one of Wheeler's sons) were living in Tulsa. David, along with another of Wheeler's sons, Mark, was living in Texas. Patricia and David stated by affidavit that they recalled reading some of the Oklahoma press coverage. Lawrence and

-22-

Mark recalled reading one or two articles, and Pamela said she did not read any of them.

On January 19, 1995, the Tulsa World published a story stating that Brian Halloran had told the FBI that John Callahan offered him a contract to kill Wheeler, but that Halloran refused the offer. The article noted that Halloran was murdered shortly thereafter in 1982. On July 11, 1997, as proceedings in the Salemme trial were developing, the Tulsa World reported that Bulger and Flemmi were "potential suspects" in Wheeler's murder and that Flemmi had executed an affidavit stating that he and Bulger were informants and "were given free reign from an FBI supervisor to commit any crime as long as they did not 'clip anyone.'" On November 9, 1997, a Tulsa television station reported that the Wheeler investigation "ha[d] been held up by the FBI's attempts to bring down the Mafia in Boston" and that "the FBI did not share information it had about the death of Roger Wheeler Senior." The next day, the Tulsa World reported that "[i]nvestigators said that the prime suspects in Wheeler's killing turned out to be two highly placed mob informants, working with the Boston FBI" and that the "Boston FBI protected their informants, James 'Whitey' Bulger and Steven [sic] 'The Rifleman' Flemmi."

On May 10, 1998, David Wheeler was interviewed by Ed Bradley on CBS's "60 Minutes" program. The following exchange was televised:

Bradley: David Wheeler, Roger Wheeler's son, says he had trouble understanding why his father's murder had remained unsolved for so long. Until he found out Bulger and Flemmi were FBI informants.

Wheeler: We've discovered that all along the FBI has been in bed with the prime suspects in my father's murder.

Bradley: So you believe that the FBI protected your father's killers and tried to prevent the truth from coming out?

Wheeler: They not only protected my father's killers, they to this day are protecting my father's killers and they are to this day withholding information from the police. This is eighteen years of covering up the crime. This is eighteen years of being an accessory to murder.

At the close of the segment, David Wheeler also said, "In the end, there's one group, one group of people, that were supposed to help us, and that was the FBI, and those are the very people that betrayed us, those are the very people that continue to betray us to this day."

During the segment, Bradley said that the "extraordinary relationship between the FBI and two organized crime bosses," namely Bulger and Flemmi, "may have allowed the FBI informants to get away with murder." The segment also contained an interview of Homicide Sergeant Michael Huff of the Tulsa police department, who said that the Boston FBI had failed to share Halloran's information with local and federal investigators in Tulsa working on the Wheeler investigation and that this failure constituted "obstruction of justice." Bradley also interviewed five detectives from Oklahoma, Florida, and Connecticut. He stated that these

detectives believed the Wheeler murder remained unsolved "because Bulger and Flemmi were protected by the FBI while they were providing information on the Italian Mafia in New England."  One detective, David Green, said that the FBI gave Bulger and Flemmi a "license to steal" and that "apparently that license got a little broader and covered a homicide."

David Wheeler said, by affidavit, that when he accused the FBI of a cover-up on "60 Minutes," he meant only that he had previously been unaware of Bulger and Flemmi's status as informants and that he "felt as though the FBI should have shared this information with [him] . . . long before this time."  He said that he did not believe at that time that the FBI was responsible in any way for his father's death and that he had no facts to support such a belief.

Patricia and Lawrence said by affidavit that they saw David on "60 Minutes."  Pamela and Mark said, also by affidavit, they did not see David on "60 Minutes" and did not discuss the show with David or anyone else.  Mark said that he was aware that David appeared on the show, but Pamela said that she could not remember if she had been aware of that fact at the time.  The Wheelers said in their respective affidavits that tensions had arisen in the family since Roger's murder and that they communicated very little among themselves, particularly concerning the painful subject of the murder.

Following the "60 Minutes" interview, David Wheeler also gave interviews to the Boston press. On May 12, 1998, The Boston Herald reported that David Wheeler said that he "has always believed that [former FBI Agent Paul] Rico facilitated his father's delivery into oblivion" but that he only recently "discovered that oblivion may well have had names like Whitey and Stevey." The article noted that David Wheeler said his father thought Rico might be trying to kill him. The article described Rico as Flemmi's "FBI mentor" and noted that Rico had recruited Flemmi as an informant. On July 22, 1998, the Boston Globe interviewed David Wheeler and described him as "now believ[ing] the FBI has obstructed the investigation into his father's murder." The article also summarized the testimony of John Morris at the Salemme hearings in April 1998, noting that Morris had testified that he told Connolly that Halloran had implicated Bulger and Flemmi in the Wheeler murder investigation and that Connolly may have passed this information on to Bulger and Flemmi. On September 29, 1998, the Boston Globe reported John Martorano, a member of the Winter Hill gang, was negotiating a plea agreement with federal prosecutors. Describing David Wheeler as "the son of one of Martorano's alleged victims," the article quoted him as stating that he would approve of a plea agreement for Martorano because "[t]he people he's giving up are the people who have enjoyed the protection of the FBI for many years while committing heinous crimes."

By affidavit, David Wheeler said that he had "probably" read these articles, but Patricia, Pamela, and Lawrence said that they had not, and Mark said that he did not recall whether he read them.

At around the same time, in the summer of 1998, there was Tulsa press coverage of developments in the Wheeler murder. On May 17, 1998, the Tulsa World published an article with the headline: "When G-men, Mobsters Are Friends/FBI Ignored Tip-Off on Tulsa Murder." The article summarized Morris's testimony in April 1998, reporting that Morris had admitted to receiving cash and gifts from Bulger and Flemmi, and to working with other agents to "shield[] Bulger and Flemmi from prosecution for 20 years because they were the most prized secret FBI informants in New England history." A summary of Morris's testimony was again reported in a July 20, 1998 Tulsa World article about the Wheeler murder. The article also reported that John Martorano had agreed to cooperate with federal prosecutors and to testify against Bulger and Flemmi in the Wheeler murder case.

On September 9, 1999, after the Wheelers' May 11, 1999 cut-off date for accrual had passed, Judge Wolf unsealed John Martorano's plea agreement, in which Martorano admitted that he had murdered Roger Wheeler. Judge Wolf's September 15, 1999 decision in Salemme described a series of specific incidents in the early 1980s, before Wheeler's murder, in which FBI agents shielded Bulger

-27-

and Flemmi from investigation. 91 F. Supp. 2d at 202-06. As to Wheeler's murder, Judge Wolf found that partly because of irregularities in the FBI's handling of the files relating to Wheeler's murder, "questions remain regarding the role, if any, played by Flemmi and Bulger in the Wheeler, Halloran, and Callahan murders, and the full degree to which the FBI in Boston has, from 1981 until recently, attempted to keep any such role from being discerned and demonstrated." Id. at 213. He noted that a pattern of false statements in Flemmi's informant file diverted attention from Flemmi's crimes and FBI misconduct, that reports containing Halloran's allegations against Bulger and Flemmi were not indexed according to usual FBI policy and hence could not be discovered through a standard search of FBI indices, and that the FBI had disobeyed discovery orders by its late disclosure of relevant documents. Id. at 154 n.3.

On December 22, 1999, John Connolly was indicted for racketeering. A superseding indictment was returned on October 11, 2000. It charged that Connolly had alerted Bulger and Flemmi to the identity of confidential law enforcement informants, tipped them off to various law enforcement initiatives, and failed to report information relating to them that was material to the investigation of criminal activity in the Boston area. It also charged that Connolly had obstructed a grand jury investigation

into Wheeler's murder and tipped Bulger and Flemmi to Halloran's cooperation.

On September 27, 2000, a federal grand jury returned an indictment charging Bulger and Flemmi with racketeering; two of the predicate acts for the racketeering charge were the murder of Roger Wheeler and the conspiracy to commit that murder.

The Wheelers filed a notice of tort claim with the FBI on May 11, 2001. After the FBI failed to respond, the Wheelers filed suit in federal court on March 14, 2002. As in the McIntyre case, the United States moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) on the ground that the Wheelers had failed to present their administrative claims within two years of accrual, as required by the FTCA, 28 U.S.C. § 2401(b). On March 31, 2003, the district court granted the motion, finding that the Wheelers' claim accrued no later than May 10, 1998, when David Wheeler appeared on "60 Minutes." The court reasoned that David Wheeler's statements showed that he knew that Bulger and Flemmi were suspected in his father's murder and that they may have escaped investigation and prosecution for the crime with the assistance of the FBI. The court then went on to say that "[i]t does not matter that not all the plaintiffs in this case were as informed as David Wheeler" because they were in possession of sufficient facts to place them on inquiry notice. Final judgment was entered on motion of the Wheelers, who then timely appealed.

## II.

### A.   The FTCA Accrual Standard

The FTCA provides, in relevant part, that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues." 28 U.S.C. § 2401(b). Because the FTCA is a waiver of sovereign immunity, it is strictly construed. Skwira v. United States, 344 F.3d 64, 73 (1st Cir. 2003).

Normally, a tort claim accrues at the time of injury. Gonzalez, 284 F.3d at 288. In United States v. Kubrick, 444 U.S. 111 (1979), the Supreme Court created a "discovery rule" exception for FTCA claims involving medical malpractice. The Court held that such claims accrue when a plaintiff knows of both the existence and the cause of his injury. See id. at 119-202. The Court determined that accrual does not await the point at which a plaintiff also knows that the acts inflicting the injury may constitute medical malpractice. Id. at 122. Distinguishing between ignorance of the facts (of injury or its cause) and ignorance of legal rights, the Court reasoned that a claimant, once armed with knowledge of the fact of injury and the identity of the parties that caused the injury, is no longer at the mercy of the government. At that point, claimants can go to others, such as doctors or lawyers, who will tell them if they are victims of malpractice. Id. The same is not necessarily true of plaintiffs

-30-

who are ignorant of the facts, particularly when the government may be in possession or control of the necessary information.

This court has extended this discovery rule to FTCA claims outside the medical malpractice context. <u>Skwira</u>, 344 F.3d at 74; <u>Attallah</u> v. <u>United States</u>, 955 F.2d 776, 780 (1st Cir. 1992). Most circuits also apply a discovery rule to wrongful death actions. <u>See</u> <u>Skwira</u>, 344 F.3d at 74 (collecting cases).

Under the discovery rule, "a claim accrues when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the factual basis for the cause of action." <u>Gonzalez</u>, 284 F.3d at 288. The test for whether a plaintiff should have discovered necessary facts is an objective one. <u>Id.</u> at 288-89. We look first to whether sufficient facts were available to provoke a reasonable person in the plaintiff's circumstances to inquire or investigate further. "A claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim, but such suspicions do give rise to a <u>duty to inquire</u> into the possible existence of a claim in the exercise of due diligence." <u>Kronisch</u> v. <u>United States</u>, 150 F.3d 112, 121 (2d Cir. 1998) (citation omitted and emphasis added). Once a duty to inquire is established, the plaintiff is charged with the knowledge of what he or she would have uncovered through a reasonably diligent investigation. <u>Skwira</u>, 344 F.3d at 77. The next question is whether the plaintiff, if armed with the results of that

investigation, would know enough to permit a reasonable person to believe that she had been injured and that there is a causal connection between the government and her injury. Id. at 78. Definitive knowledge is not necessary. Id. This inquiry is highly fact- and case-specific, as are the pertinent questions to ask.

In Attallah, for example, the plaintiffs learned in September 1982 that the decomposed body of their courier, who had been transporting almost $700,000 of their money to Puerto Rico, had been found. 955 F.2d at 778. Over four years later, two Customs agents were indicted for the robbery and murder of the courier. Id. The court found that the plaintiffs had filed a timely administrative claim against the United States because their claim accrued when the Customs agents were indicted, not when the courier's body was found. Id. at 780. The court focused on the fact that aside from the indictment, the only information that the plaintiffs had available about the whereabouts of their courier was a Customs Service document showing that their courier had been processed at the airport customs office and then left the premises. Id. The court reasoned that if it took the police until 1987 to discover sufficient information to bring charges against the Customs agents, the plaintiffs could not be expected to be more efficient. Id.

Another example is the Skwira case, in which a divided court, in three opinions, found that the plaintiffs had failed to

file a timely administrative claim.  <u>Skwira</u>, 344 F.3d at 83-86. There, the claim was that a VA nurse had murdered Edward Skwira, a patient at the Northampton VA hospital, by injecting him with the stimulant epinephrine.  The facts convincing to the majority on the issue of accrual were as follows.  Skwira was admitted to a substance abuse treatment facility in Worcester, Massachusetts, in early February 1996 for the treatment of chronic alcoholism and on February 15 was transferred to Ward C of the VA hospital, where the murderess was working.  <u>Id.</u> at 69.  Despite the absence of any reason to anticipate heart problems, he suffered a catastrophic cardiac event later that day and died on February 18, with heart ailments listed as the immediate cause of death.  <u>Id.</u>  By the summer of 1996, articles began appearing in the Northampton local press describing an ongoing criminal investigation into the high number of suspicious deaths in Ward C, and the administrator was quoted as not ruling out foul play.  <u>Id.</u> at 68, 80.  By September or October of 1996, investigators contacted the families of some of the victims, including Skwira's, to voice the government's "suspicions" about the deaths and obtained permission to exhume and autopsy the bodies.  <u>Id.</u> at 68.  Skwira's autopsy showed that the death certificate had misstated the cause of death.  <u>Id.</u>  As the concurring opinion stated, at that point "a reasonable person would have believed that some kind of negligence or misconduct by government employees at the hospital might well underlie Edward

Skwira's death." Id. at 85 (Boudin, C.J., concurring). Had the plaintiffs sought out independent legal and medical advice at that point, they should have been able to determine in the two-year period whether to file an administrative claim. See Skwira, 344 F.3d at 81. The court observed that two other victims' families did file timely claims, whereas the Skwiras waited three years after the autopsy report before filing. Id. at 82 n.19.

Skwira is instructive in the ways in which it is both like and unlike the two cases at bar. The differences are obvious. Unlike the victims in the cases at bar, Skwira was in the sole custody and care of a government hospital and, overwhelmingly, the most likely malefactor was one of a very limited group of government employees at that hospital. All of the deaths occurred in the same place with the same small cast of characters. See United States v. Gilbert, 229 F.3d 15, 18 (1st Cir. 2000) (the deaths in Ward C of the VA hospital occurred over a six-month period). There was also certainty the patients were dead, unlike in McIntyre's situation.

The chief similarity between the two cases at bar and Skwira is that there was a government investigation into possible wrongdoing in all three cases. But the circumstances of the investigation here were different than in Skwira. There, the government came to the family with its suspicions of wrongdoing at the hospital and explained the factual basis for those suspicions.

-34-

344 F.3d at 68. The government then helped develop the evidence of wrongdoing, informing the family that the cause of death reported was different than that found in Skwira's autopsy. Id. By contrast, in the two cases at bar, the government did not inform the plaintiffs of any investigation, appears to have held the facts revealed in its investigation confidential, and ultimately claimed to have cleared its agents of wrongdoing before the critical dates for accrual purposes.[5]

## B. Application to McIntyre's Claims

The claims made by the estate of McIntyre are based on two interrelated theories of how the FBI caused McIntyre's death: (1) by leaking his confidential informant status to Bulger and Flemmi, in violation of a special duty of non-disclosure owed to him by the government, and (2) by protecting Bulger and Flemmi from investigation and prosecution, thus enabling and emboldening them to murder him. As we understand the second theory, it is meant to buttress the first theory; it is perhaps also meant to serve as an independent basis for liability.[6] The first theory, which we understand to be the predominant one, arises out of a special duty

---

[5] The plaintiffs here do not argue that the pendency of a government investigation should automatically toll accrual of their claims. That argument was rejected in Skwira, which found no statutory basis for such tolling. See 344 F.3d at 85-86 (Boudin, C.J., concurring).

[6] To the extent that the plaintiff does intend the second theory as an independent basis for liability, the United States is free to challenge the availability of that theory on remand.

that the government has to confidential informants who would be endangered if their informant status were revealed to others, particularly those whose activities are the subject of the informant's disclosures. The FBI Manual requires agents to exercise constant care to ensure that an informant's identity is not disclosed, whether intentionally or inadvertently. Salemme, 91 F. Supp. 2d at 150; see also Leonhard v. United States, 633 F.2d 599, 614 (2d Cir. 1980) ("The procurement of testimony against alleged members of organized crime will normally require appropriate protection of both the informant and his family."); Socialist Workers Party v. Attorney Gen. of United States, 458 F. Supp. 895, 907 (S.D.N.Y. 1978) ("[T]he FBI asserted that it owed the duty of confidentiality to the informants to protect them from embarrassment and harm."), vacated on other grounds, In re Attorney Gen. of United States, 596 F.2d 58 (2d Cir. 1979). Because we find that the plaintiff could not reasonably be expected to have discovered the facts supporting the first theory until after May 25, 1998, we find that the case was not properly dismissed and therefore reverse.

The plaintiff's predominant theory depends on the following reasoning:

1. McIntyre was cooperating with the government in its investigation of Bulger and Flemmi, which imposed a duty on the FBI;

-36-

2.    McIntyre was murdered;

3.    Bulger and Flemmi were responsible for the murder;

4.    McIntyre was murdered because Bulger and Flemmi learned he was informing on them to government authorities;

5.    It was agents of the FBI, Connolly and/or Morris, who told Bulger and Flemmi that McIntyre was cooperating with the FBI.

The district court focused on the first three parts of this sequence only. This did not go far enough. The key missing links are the fourth and fifth points. We focus on the fifth: whether a reasonable person in the McIntyres' position, after conducting a diligent investigation, would have uncovered a sufficient factual basis to believe, before May 25, 1998, that the FBI was the source of the leak to Bulger and Flemmi. We conclude that he or she would not have.

Certainly before May of 1998, the McIntyre family knew of facts that would permit a reasonable person to believe that Bulger and Flemmi were responsible for the killing of John McIntyre in 1984 and that Bulger and Flemmi were FBI informants. In our view, that was not enough to trigger accrual, in light of the nature of McIntyre's claims.

A June 1997 <u>Boston Globe</u> article, described in our review of the facts, reported that witness statements and other evidence supported the conclusion that Bulger and Flemmi had McIntyre kidnapped, tortured him to find out what he had told the authorities, and then murdered him. Implicit in this report was that Bulger and Flemmi had somehow found out McIntyre was an informant. But the article never even mentioned the possibility that the FBI had disclosed this information to Bulger and Flemmi or had otherwise given its imprimatur to the murder.

Furthermore, the McIntyres were also faced with the government's affirmative denials of any wrongdoing in the relationship between Bulger and Flemmi and FBI agents Morris and Connolly. The government repeatedly denied wrongdoing in <u>Boston Globe</u> articles from 1988 through 1995, and one article reported that an internal FBI investigation had cleared the two agents. Then, a December 5, 1997 <u>Boston Herald</u> article stated that the Department of Justice's Office of Professional Responsibility had investigated and "cleared the FBI handlers [Morris and Connolly] of [wrongdoing involving] informant gangsters Whitey Bulger and Stephen Flemmi." Faced with a denial of wrongdoing by the FBI itself, and lacking any basis to controvert the denial other than rumor, the McIntyres did not have a reasoned basis to believe that it was the FBI that had leaked McIntyre's identity as an informant to Bulger and Flemmi.

We turn to the question whether there was later information between the December 5, 1997 denial of wrongdoing by the FBI and May 25, 1998 that provided notice of that missing link. The district court found such an event based on testimony by Agent Stutman, the former local chief of the DEA, in the Salemme hearings on April 15, 1998. Because Emily McIntyre attended part of those hearings, the court attributed to her knowledge of Stutman's statements that he and agents in his office suspected that the FBI had compromised their investigation of Bulger and Flemmi but had no facts to confirm their suspicions. Even assuming that statement provided a reasoned basis to believe that the FBI had compromised the DEA's investigation, perhaps by tipping Bulger and Flemmi to listening devices or warning them of raids, it does not provide a reasoned basis to believe that the FBI leaked McIntyre's informant status to Bulger and Flemmi.

The government points to a different event: an April 23, 1998 Boston Herald story reporting that the previous day, Morris had testified that in 1982, he told Connolly, who in turn told Bulger and Flemmi, the identity of FBI informant Brian Halloran, who had informed authorities that Bulger and Flemmi tried to hire him to kill Roger Wheeler. The government argues that this information -- that the FBI had leaked to Bulger and Flemmi the identity of a different informant, as to a different crime, at a different time -- provided sufficient facts for a reasonable person

to believe that the same thing had happened to McIntyre.  The government argues that if there was evidence Bulger and Flemmi killed Halloran because the FBI told them Halloran was an informant, then a reasonable person could have inferred that Bulger and Flemmi also killed John McIntyre based on a similar FBI leak. The government's analogy overreaches both as a matter of logic and as a matter of fact.

Even assuming arguendo that the Boston Herald article was enough to lead the McIntyres to suspect that the FBI leaked McIntyre's identity, and thus to trigger a duty to inquire, a reasonably diligent investigation would still not have revealed the necessary factual predicate for their claim before the accrual date.  Most avenues of investigation were cut off by the possibility of criminal liability for any FBI agents and others involved.  Attempts to gain information through depositions would likely have been thwarted by invocations of the Fifth Amendment privilege against self-incrimination.  And other information -- such as testimony before the grand jury or facts discovered in the government investigation -- was hidden behind a veil of secrecy. In this sense, the McIntyres had even less access to critical information than most FTCA plaintiffs.  See Kubrick, 444 U.S. at 122 (adopting a discovery rule in part because "the facts about causation may be in the control of the putative defendant,

unavailable to the plaintiff or at least very difficult to obtain").

Without more specific information than provided in the Boston Herald article, a reasonable person could not have had a basis to claim that the FBI betrayed McIntyre's cooperation to Bulger and Flemmi. Bulger and Flemmi apparently murdered people for many reasons. Some of those people were informants. But, without more, one cannot reasonably deduce from a victim's informant status (1) that Bulger and Flemmi knew the victim to be an informant, (2) that, if Bulger and Flemmi knew the victim to be an informant, they murdered the victim for that reason, and (3) most importantly, that even if Bulger and Flemmi murdered the victim for being an informant, the source of their information as to the victim's informant status was the FBI. One could not reasonably infer, for purposes of FTCA accrual, from Morris's testimony about Halloran that the FBI told Bulger and Flemmi about every informant in their organization or that Bulger and Flemmi killed every person that they knew to be informing against them, regardless of the circumstances.

Drawing a direct parallel between the murders of Halloran and McIntyre is particularly difficult because the situations were so different. The cases involved different and unrelated underlying crimes that took place at different times and in different places: the Wheeler murder was in 1981 in Oklahoma and

was related to control of a Jai Alai empire, whereas the Valhalla gun-running operation was in 1984 in Boston for the IRA. Moreover, Halloran arguably posed a greater threat to Bulger and Flemmi as an informant than McIntyre did. As Bergeron noted, and as Bulger and Flemmi might well have been aware, McIntyre was "petrified" of the two and was unlikely to come forward publicly or, by implication, to testify. McIntyre was a low-level operative in a gun-running operation, whereas Halloran was a hit man with the power to implicate Bulger and Flemmi for murder. Another factual difference is that there was some indication, as the prosecution itself argued in Salemme, that McIntyre's cooperation was known to those outside the government, and thus that Bulger and Flemmi could have discovered this information from some source other than the FBI. A January 29, 1995 Boston Globe article reported that "[r]umors that McIntyre was talking [to the federal government] were rampant" at the time.

The government's own behavior further undercuts its argument here that there were sufficient facts before May 25, 1998 to reasonably infer that FBI had betrayed McIntyre. In response to a defense objection during the cross-examination of Bergeron in the Salemme hearings on June 4, 1998, the prosecution said that "there's literally a dozen people" outside the FBI who knew of McIntyre's cooperation and could have passed the information to Bulger and Flemmi. The prosecutor argued that Judge Wolf

-42-

"shouldn't infer that there was some leak from the FBI that led to Mr. McIntyre's disappearance" because the evidence was too speculative. That, of course, is directly contrary to the position of the United States as stated in the case at bar: that before May of 1998, the McIntyres not only should have drawn exactly that inference but should have acted on it by seeking legal and other expert advice about filing an FTCA claim.

In the June 1998 Salemme hearings, after the critical date for accrual purposes had passed, the prosecution also sought to establish in its questioning of Bergeron that McIntyre had spoken to authorities about a number of notorious individuals, as well as the IRA, "[a]ll of whom would have had a motive to make him disappear." This casts further doubt on whether Bulger or Flemmi had caused McIntyre's disappearance, making even more remote the inference that the FBI had leaked McIntyre's identity as an informant and caused his murder.

This government position in June of 1998 is significant for several reasons. It shows that there was a real basis to question whether it was at all reasonable to infer that Connolly had disclosed McIntyre's dual role to Bulger. We have no reason to think the federal prosecutor's position in Salemme was taken in bad faith. The prosecution, which had access to confidential information and was in possession of far more facts than members of the public, argued to the court that it could not reasonably make

such an inference.  The McIntyres, who were in a far worse position to access or evaluate information, should not be required here to draw such an inference.  See Attallah, 955 F.2d at 780 ("The police did not have sufficient information to bring charges against the [relevant government officials] until 1987.  We believe [plaintiffs] could not have been more efficient.").

Equally importantly, the prosecutor's position in June of 1998 was yet another expression by the United States in a public forum that Connolly had not leaked McIntyre's identity and no wrongdoing had occurred.

Our decision in Skwira hurts rather than helps the government's position.  The United States in Skwira told the plaintiff that there was cause to investigate suspicious deaths of patients who were within the sole custody of a VA hospital when they died and did not deny wrongdoing.  344 F.3d at 80.  Here, the government kept confidential its investigation of claims of misconduct by Connolly and Morris and ultimately reported in 1997 that it found no wrongdoing.  Even Judge Wolf had great difficulty in prying loose coherent information about McIntyre's death by the date of his opinion on September 15, 1999.  Judge Wolf commented that the question of whether the FBI disclosed McIntyre's identity could not "be resolved on the present record" because of the government's delayed disclosure of documents and its desire to

avoid bringing to light the circumstances surrounding McIntyre's death. Salemme, 91 F. Supp. 2d at 215.

We reverse the dismissal of the claims by McIntyre's estate and remand.

## C.    Application to the Wheeler Case

The cut-off date for the accrual of the Wheelers' claim, filed on May 11, 2001, is May 11, 1999.  The district court concluded that their claim accrued on or before May 10, 1998 when Roger Wheeler appeared on "60 Minutes."

The Wheeler case is based on a fundamentally different legal theory than the McIntyre case.  Unlike the McIntyre case, which is based on duties arising from the government/informant relationship, the Wheelers' claim is not based on any direct relationship between Roger Wheeler and the FBI.  The theory of liability is, as a result, much more indirect than that in the McIntyre case.

The Wheelers have styled their Mass. Gen. Laws. ch. 229, §§ 2 and 6 wrongful death claims against the United States as based on both direct and vicarious liability.  They assert that the United States is vicariously liable for the actions of Connolly, Morris, and other agents, which provided Bulger and Flemmi with a "protective shield" against prosecution and investigation that gave the two criminals the opportunity to commit crimes and emboldened them to do so, proximately causing Wheeler's murder.  The Wheelers

-45-

also assert that the United States is directly liable for failing to prevent Wheeler's murder, in light of the foreseeable risk that Bulger and Flemmi would continue to engage in violent criminal activity. In addition, the Wheelers assert a generalized count against the United States for intentional infliction of emotional distress based on Wheeler's murder.

For the Wheelers' claims to accrue, there had to be facts available that would permit a reasonable person to conclude (1) that Bulger and Flemmi were instrumental in the murder of Roger Wheeler; (2) that Bulger and Flemmi were informants for the FBI; and (3) that the FBI had a special relationship with Bulger and Flemmi that protected and encouraged them in their criminal activity, including Wheeler's murder.

The Wheelers clearly had sufficient notice of the first two sets of facts before the May 11, 1999 accrual date. On April 22, 1998, Morris testified that Bulger and Flemmi were valuable FBI informants and that he was afraid he had sent Halloran to his death by telling Connolly that Halloran was alleging that Bulger and Flemmi had tried to hire him to kill Wheeler. Morris's testimony on this point received national press attention. It was summarized in two Tulsa World articles on May 17, 1998 and July 20, 1998 and in a July 22, 1998 Boston Globe article that quoted David Wheeler. In addition, a July 20, 1998 Tulsa World article and a September 29, 1998 Boston Globe article, which quoted David Wheeler, both reported

that John Martorano was negotiating a plea agreement with federal prosecutors and had implicated Bulger and Flemmi in the Wheeler murder. In addition, as the district court fairly pointed out, David Wheeler stated on the May 10, 1998 "60 Minutes" show that Bulger and Flemmi had caused his father to be murdered, that the two were FBI informants, and that the FBI was "in bed" with the two.

What proves fatal to the Wheelers' claim is that they were also on notice of the third set of facts. We sidestep the dispute about whether David Wheeler meant his statements on "60 Minutes" to indicate that the FBI had protected Bulger and Flemmi from prosecution and thus enabled and emboldened them to murder his father. Other statements on the "60 Minutes" show should have made clear the special relationship between the FBI and Bulger and Flemmi. Ed Bradley reported that the "extraordinary relationship" between the FBI and Bulger and Flemmi "may have allowed [them] to get away with murder." A detective interviewed for the segment was even more explicit, describing Bulger and Flemmi as having a "license" from the FBI to commit crimes that "covered a homicide."

In addition, separate from the "60 Minutes" show, there was national and local news coverage before the critical date describing the FBI's shielding of Bulger and Flemmi from prosecution. At least some of those articles should have caught the Wheelers' attention, because they specifically referenced Roger

Wheeler's murder and even, in several instances, quoted David Wheeler.

Two Tulsa World articles on July 11, 1997 and January 9, 1998, both of which specifically mentioned the Wheeler murder, reported that Flemmi was claiming in the Salemme proceedings that the FBI gave him and Bulger immunity from prosecution for their ongoing criminal activities in exchange for information about organized crime activities. The July 11 article specifically noted that Flemmi had executed an affidavit stating that he and Bulger had been given "free reign from an FBI supervisor to commit any crime" short of murder. On May 10, 1998, the same night that the "60 Minutes" segment ran, a local Tulsa news station, KOTV, reported that the FBI had tipped Bulger and Flemmi to Halloran's cooperation in the Wheeler murder investigation and that Boston FBI agents may have taken bribes from Bulger and Flemmi.

In the summer of 1998, two Tulsa World articles and one Boston Globe article that quoted David Wheeler reported that Morris admitted that the FBI had shielded Bulger and Flemmi from prosecution for twenty years because they were prized informants. The Tulsa World article was entitled "When G-men, Mobsters Are Friends/FBI Ignored Tip-Off on Tulsa Murder." All three articles specifically mentioned the Wheeler murder. Morris's testimony was also picked up by the national press, with coverage in May and June of 1998 from the Associated Press, the Salt Lake Tribune, the

<u>Charleston Gazette & Daily Mail</u>, the <u>L.A. Times</u>, and the <u>Seattle Times</u>.

In the summer and fall of 1998, following the "60 Minutes" segment, David Wheeler himself drew the connection between his father's murder and the FBI's special relationship with Bulger and Flemmi in his comments to the Boston press. In a May 12, 1998 article headlined "Dad's execution mystery no more to anxious son," the <u>Boston Herald</u> described David Wheeler as saying in an interview that he "always believed" that former FBI agent Paul Rico "facilitated" his father's murder at the hands of Bulger and Flemmi. Wheeler also told the <u>Boston Globe</u> on September 29, 1998 that John Martorano's cooperation would expose "people who have enjoyed the protection of the FBI for many years while committing heinous crimes."

The Oklahoma press and television coverage, the information revealed on "60 Minutes," and David Wheeler's interviews with the Boston press are sufficient to establish that <u>David Wheeler</u> was clearly on notice before the May 11, 1999 critical date.

The issue is whether the other family members, in their different positions, could reasonably be expected to be aware of this information. The district court focused on David Wheeler and attributed his knowledge to all. We disagree with that methodology: the "knew or reasonably should have known" question must be asked individually, as to the information available to someone in each

plaintiff's situation. There is a difference between "knew" and "should have known." A plaintiff could, at least in theory, have actual knowledge of critical facts even though he or she would not otherwise be reasonably expected to know them. As to whether a plaintiff "reasonably should have known" critical facts, the inquiry is an objective one: whether a reasonable person <u>similarly situated</u> to the plaintiff would have known the necessary facts. <u>See</u> <u>Skwira</u>, 344 F.3d at 80 (the "degree of knowledge of injury and cause that would prompt a reasonable person to take . . . protective steps will vary with the circumstances of the case"); <u>cf.</u> <u>Rodriguez Narvaez</u> v. <u>Nazario</u>, 895 F.2d 38, 41 n.5 (1st Cir. 1990) (describing a similar constructive knowledge test, used to determine accrual of federal civil rights claims, as whether "a reasonably prudent person similarly situated" should have known the necessary facts).

Where there are several plaintiffs and they do not live in the same geographical area, and public notice of the underlying facts is restricted to certain areas, geography is a factor to be considered. Geography may be particularly relevant where, as here, notice is based on local television and press coverage. Similarly, where, as here, some members of the family have actual notice but others do not, the issue of how strong the family's ties are and how frequently they communicate can be relevant. A plaintiff who is estranged from other more knowledgeable family members is

differently situated than one who speaks with his or her family every day.

Despite this leeway, the record here establishes that each of the Wheelers had available sufficient facts to raise suspicions provoking a reasonable person to inquire further. See Phillips Exeter Academy v. Howard Phillips Fund, Inc., 196 F.3d 284, 288 (1st Cir. 1999) (this court "may affirm the judgment for any independent reason made manifest in the record"). Had the Wheelers inquired further, the requisite facts were present in the Boston and Oklahoma television and press coverage to allow a reasonable person to infer a causal connection between the FBI's actions and Roger Wheeler's murder.

Patricia Wheeler (Roger's widow) saw the "60 Minutes" program in May 1998 and some of the Oklahoma press articles; they were sufficient at least to trigger a duty to inquire before the May 11, 1999 critical date, painful as the subject was to her. The same is essentially true of Lawrence Wheeler, one of Roger's sons.

Pamela Wheeler Norberg (Roger's only daughter) did not see the "60 Minutes" segment. She has stated by affidavit that she did not read any of the press coverage in the record on the painful subject of her father's murder, and that she is estranged from her brothers and communicates with them only infrequently. While her claim presents a closer case, we find that she had a duty to inquire based on local and national press coverage. "[W]here events receive

. . . widespread publicity, plaintiffs may be charged with knowledge of their occurrence." United Klans of Am. v. McGovern, 621 F.2d 152, 154 (5th Cir. 1980) (national news coverage over networks, wire, and newspapers reported that defendant held press conference admitting facts supporting the claim); see also Hughes v. Vanderbilt Univ., 215 F.3d 543, 548 (6th Cir. 2000) (front-page stories in two local newspapers and a major television network gave rise to constructive knowledge, even though plaintiff said she did not see the coverage). Although we recognize that the question of whether a reasonable person in Pamela's position would have read news coverage is a fact-intensive inquiry and can sometimes be difficult to resolve on a motion to dismiss,[7] we find that, on the facts of this case, the record is sufficient to establish notice. Local news coverage in Tulsa, where Pamela lived, was extensive and mentioned Roger Wheeler specifically by name, often in the lead paragraph of the story. Furthermore, nothing in the record shows that Pamela was estranged from her mother, who did watch the "60 Minutes" show and read at least some press coverage. A reasonable person in Pamela's

---

[7] See Bibeau v. Pac. Northwest Res. Found., Inc., No. 97-35825, 1999 U.S. App. LEXIS 38092, at *13 (9th Cir. Aug. 19, 1999) (additional factfinding necessary to determine if press coverage would have reasonably put a similarly situated plaintiff on notice); Orikow v. United States, 682 F. Supp. 77, 85 (D.D.C. 1988) (more factfinding necessary for accrual of FTCA claim because "[n]ewspaper articles containing allegations do not necessarily place citizens on notice when there is no evidence that these articles were read").

situation would have been provoked to inquire further; had she done so, she would have filed a claim earlier.

Mark Wheeler, the youngest son, lives in Texas and did not see the "60 Minutes" show, although he was aware that his brother would be appearing on it. He stated by affidavit that he read only one or two of the articles in the Tulsa press and that he communicates only infrequently with his family because of tensions arising from his father's murder. He presents an even closer case than Pamela because he lived in Texas and the television and press coverage in the record appeared mostly in either Boston or Tulsa sources. But we find that he too had a duty to inquire, which if pursued, would have led him to file his claim earlier. He was aware of the "60 Minutes" show and, by implication, of national news coverage of his father's murder. He had access to Tulsa news, as demonstrated by his reading of at least one or two articles in the Tulsa newspapers on the subject of his father's death, so if he had inquired further, he could have learned the necessary facts through that medium.

The claim of equitable tolling of the two-year limit fails, to the extent that such a claim is cognizable against the government at all.[8] It is true that the FBI had a long history of

---

[8] Compare Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 94 (1990) (stating that equitable tolling applies in Title VII suits against the government on the same terms as it would against a private employer), with United States v. Beggerly, 524 U.S. 38, 49-50 (1998) (holding that equitable tolling does not apply to actions under the Quiet Title Act, 28 U.S.C. § 2409a, for reasons

denying that Bulger and Flemmi were informants, that there was any "special" relationship between the FBI and the two, and then that any impropriety resulted from the relationship.  For purposes of equitable tolling, however, the government's denials were superseded when Morris testified in April 1998 in the <u>Salemme</u> hearings that he and Connolly shielded Bulger and Flemmi from prosecution and that they may have been responsible for Halloran's death.

### III.

The dismissal of the claim against the United States in the McIntyre case is **<u>reversed</u>** and the case is remanded for further proceedings consistent with this opinion.  The dismissal in the Wheeler case is **<u>affirmed</u>**.

---

that could also apply to the FTCA).