**Markus Allec RICE, a minor, By and Through his mother and next friend, Angela Danita RICE, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 94–C–264–K.

United States District Court, N.D. Oklahoma.

May 19, 1995.

Stephen C. Wolfe, Wolfe & Vogle, Cindy L. McNeely, Tulsa, OK, for plaintiff.

Peter Bernhardt, U.S. Atty., Tulsa, OK, Kathleen Bliss, Dept. of Justice Crim. Div., Child Exploitation & Obscenity Section, Washington, DC, for defendant.

## ORDER

KERN, District Judge.

Plaintiff Markus Allec Rice ("Markus"), a minor, brings this lawsuit through his mother and next friend, Angela Danita Rice ("Ms. Rice"), pursuant to the Federal Tort Claims Act ("FTCA"). 28 U.S.C. § 2671 *et seq.* In the Complaint, Ms. Rice claims that health care providers at Claremore Indian Hospital ("CIH"), a government facility, rendered negligent medical care by allowing Ms. Rice to progress in her pregnancy for forty-three weeks without intervention, failing to monitor adequately the condition of Ms. Rice and Markus, failing to suction and intubate Markus properly, failing to monitor Markus following delivery, failing to diagnose and treat Markus' condition in a timely manner, and failing to transport Markus to another facility equipped to treat high-risk infants. As a result of alleged negligence, Markus is suffering from severe lung damage, a heart problem, and "is slow." The Plaintiff demands $15 million in damages.

The United States has asked this Court to grant summary judgment, stating that Plaintiff did not file an administrative claim within two years of the injury as is required by the FTCA. 28 U.S.C. § 1346(b) and 28 U.S.C. § 2401(b). An administrative claim was filed in this action on April 23, 1993. If the action is held to accrue prior to April 23, 1991, the claim is barred. The Defendant argues that the injury occurred on October 3, 1990 when Markus was born and diagnosed with meconium aspiration syndrome. The Plaintiff believes the statute should be tolled until October of 1992 when she was told that Markus inhaled waste into his lungs after birth.

## I. *Facts*

Ms. Rice was diagnosed as pregnant on January 19, 1990 at CIH, the hospital where she received prenatal care until April 20, 1990. She ceased prenatal care and did not return to CIH until September 19, 1990, six days after her estimated due date. Ms. Rice consented to an elective cesarean section on October 3, 1990 after labor could not be induced. At that point, she was almost three weeks past due.

At delivery, medical personnel noted thick meconium stained amniotic fluid. Meconium constitutes the first stools of the newborn infant. According to the Defendant, the pediatrician suctioned 4 cc of thick meconium stained amniotic fluid from Markus' stomach and resuscitated him with oxygen blow and by cutaneous stimulation. Markus received APGAR scores of 6 at one minute and 9 at five minutes. A score of 10 indicates the best condition.

Although vital signs were positive during the morning and early afternoon, a nurse found Markus to be deeply cyanotic over his body and making grunting respirations at 4 p.m. The pediatrician was contacted STAT. After taking X-rays and performing various emergency measures, CIH contacted the

Saint Francis Hospital Eastern Oklahoma Perinatal Center ("EOPC") for transfer of Markus to that facility.

In preparing the transport report, Deborah Kurtz, EOPC transport nurse, reviewed medical records and assessed Markus. Kurtz listed first in her assessment of Markus that he was suffering from "respiratory distress/meconium aspiration." Def.'s Amended Mot. for Summ.J., Ex. C, p. 55. She also says she informed Ms. Rice that the baby suffered from respiratory distress that might have been due to "bowel movement in the fluid." Def.'s Amended Mot., Exh. D, p. 41. She states that it would have been her practice to explain this problem list to Ms. Rice. Although she cannot remember her exact words, Kurtz says she has no reason to believe that she did not explain the baby's status to Ms. Rice.

During October of 1990, Dr. Alfred Vitanza treated Markus at Saint Francis Hospital. In deposition testimony, Dr. Vitanza testified that Markus swallowed meconium either before or at the time of delivery. Due to a deteriorating condition, Dr. Vitanza and other conferring physicians determined that Markus should be placed on extra corporal membrane oxygenation ("ECMO"). Without such a procedure, Dr. Vitanza believed Markus faced an 80 percent mortality risk. In acquiring consent from Ms. Rice, Dr. Vitanza says he is positive he told Ms. Rice that Markus had a severe lung problem as a result of swallowing or the aspiration of meconium. Moreover, Dr. Vitanza noted that meconium aspiration was reiterated throughout the medical records. Beverly Hunt, a nurse in EOPC during October of 1990, testified that she witnessed the telephone consent taken by Dr. Vitanza from Ms. Rice and that she would not have approved the consent unless Ms. Rice understood the nature of the medical problem faced by Markus. In addition, Rachel Samuelson, a social worker at Saint Francis, testified that she counselled Ms. Rice about Markus and that Ms. Rice understood that Markus was very sick.

In contrast, Ms. Rice has a different recollection of the period immediately following Markus' birth. Ms. Rice recalls that a doctor from Saint Francis called her for permission to put Markus on ECMO, stating that Markus was born with a breathing problem which could be alleviated by the ECMO machine. Although Ms. Rice knew Markus might die because he was not breathing properly, she denies that the doctor told her why he was not breathing correctly. After a forty-day stay, Markus left Saint Francis.

Markus was treated for an ear infection by Dr. Faith Holmes at the Indian Health Care Center in Tulsa, Oklahoma on January 10, 1991. There is a notation in those records indicating that Markus had a history of meconium aspiration and was hospitalized for "swallowing stools." Dr. Holmes testified that any information listed on the chart would have come from whomever brought Markus into the facility, not from other medical records or communications with physicians. Ms. Rice admits that she took Markus to the Indian Health Care Center on that date. Indeed, in a case management conference dated May 11, 1995, counsel for Ms. Rice acknowledged that Ms. Rice provided the medical information listed in the chart. On December 7, 1991 Markus was admitted to Tulsa Regional Medical Center for fever and difficulty in breathing. The history and admission records provide as follows:

> Following cesarean section, the patient had aspirated some meconium and the mother states that the patient was intubated for a child [sic]. The patient was hospitalized for one month following his birth. Also, it is significant to note that the patient had some sort of plasmapheresis during his hospital stay and had surgery for some sort of abdominal fluid accumulation, *according to the mother.*

Exhibit L at 104 (emphasis added).

Despite this notation, Ms. Rice argues that she did not know about meconium aspiration until October of 1992. Ms. Rice says she learned about the cause of Markus' illness after an appointment with a pediatric cardiologist when she was pregnant with a second child. Due to concern that she might pass on to another child the same problems experienced by Markus, she inquired about the risk of such a scenario. In response, Dr. Cooper allegedly informed her that Markus' breathing problems were not hereditary, but were

caused because "he had inhaled some poop into his lungs." According to Ms. Rice, she did not suspect that meconium aspiration, related to treatment at CIH, was the cause for Markus' breathing illness until it was suggested to her by Dr. Cooper.

## II. *Summary Judgment Standard*

Summary judgment pursuant to Fed. R.Civ.P. 56 is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 274 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Windon Third Oil and Gas v. Federal Deposit Insurance Corporation,* 805 F.2d 342, 345 (10th Cir. 1986), *cert. den.* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). In *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552 (1986), it is stated:

> "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must affirmatively prove specific facts showing there is a genuine issue of material fact for trial. In *Anderson v. Liberty Lobby, Inc.,* the Court stated:

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

477 U.S. at 252, 106 S.Ct. at 2512. The Tenth Circuit requires "more than pure speculation to defeat a motion for summary judgment" under the standards set by *Celotex* and *Anderson. Setliff v. Memorial Hospital of Sheridan County,* 850 F.2d 1384, 1393 (10th Cir.1988).

## III. *Discussion*

This summary judgment motion requires the Court to evaluate when the action against CIH accrued for purposes of the limitations provision of the FTCA. 28 U.S.C. § 2401(b) provides:

> A tort against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues . . . .

This dispute puts at issue the question of accrual. If the tort accrued more than two years before the administrative complaint of April 23, 1993, then the action is barred.

Defendant claims the action accrued on October 3, 1990, the day Ms. Rice received a cesarean section. Ms. Rice argues that the action did not accrue until two years later, pointing to the conversation she had with Markus' pediatric cardiologist, Dr. Cooper. At that time Ms. Rice was pregnant with her second child and asked Dr. Cooper about the prospects for passing on the breathing condition to her unborn child. Only then, according to Ms. Rice, was she told that Markus was not "born with" his condition and that it was not a hereditary problem.

In *United States v. Kubrick,* 444 U.S. 111, 120, 100 S.Ct. 352, 358, 62 L.Ed.2d 259 (1979), the Supreme Court adopted the general rule that a cause of action accrues under the FTCA when "the plaintiff has discovered both his injury and its cause." In light of *Kubrick,* Plaintiff is not correct when stating in the Complaint that "[t]he Statute of Limitations does not commence until one knows or should have known of negligence." Complaint, para. 9. Instead, the courts focus on knowledge of injury and its cause rather than on when a party determines that negligence was at work.

In the present case, there is no doubt that Ms. Rice discovered that Markus was injured within a few days and weeks following his birth. Markus' illness was not latent. Instead, it was clear as soon as he showed signs of respiratory distress a few hours after birth and had to receive life-saving emergency treatment. Ms. Rice learned that Markus faced a high mortality

risk and had to consent to the dangerous ECMO procedure. To be aware of an injury, a plaintiff need not know the full extent of his or her injury. The limitations period will run even though the ultimate damage is unknown or unpredictable. *Robbins v. United States,* 624 F.2d 971, 973 (10th Cir.1980). In light of Markus' chronic breathing deficiency in his first weeks and months of life and the treatment he received, it is clear that Ms. Rice knew that Markus suffered from an injury before April 23, 1991.

Causation is the more difficult issue in this case. As interpreted by the Fifth Circuit, the *Kubrick* decision means that the causation element is satisfied when a plaintiff has knowledge of facts that would "lead a reasonable person (a) to conclude that there was a causal connection between the relevant treatment and injury or (b) to seek professional advice, and then with that advice, to conclude that there was a causal connection between the treatment and injury." *MacMillan v. United States,* 46 F.3d 377, 381 (5th Cir.1995) (quoting *Harrison v. United States,* 708 F.2d 1023, 1027 (5th Cir.1983).

■ Ignorance of cause is not necessarily an excuse that tolls the limitations period. The Tenth Circuit has placed a burden on potential plaintiffs of reasonable diligence in inquiring as to the causes of their injuries. *Arvayo v. United States,* 766 F.2d 1416, 1422 (1985). In *Arvayo,* the court barred the parents' claim where they had never made any inquiries into the cause of their child's injuries. *Id.* Rather than a duty of disclosure on the part of doctors, the Tenth Circuit imposed a duty of inquiry on the part of plaintiffs under the FTCA. *Id.* In so holding, the Court relied on *Gustavson v. United States,* 655 F.2d 1034 (10th Cir.1981) and stated:

> Inasmuch as the plaintiff in *Gustavson* was not explicitly informed as to a possible connection between the lump in his neck and his kidney problems in 1973, this court implicitly placed a burden upon him to discover not only whether these doctors breached a duty to him, but also to discover in the first instance whether there was a causal connection between their actions, or inactions, and his injury.

*Arvayo,* 766 F.2d at 1422. However, before the duty of inquiry attaches, the injured party must be armed with the "critical facts" underlying the injury. *Kubrick,* 444 U.S. at 123, 100 S.Ct. at 360; *Arvayo,* 766 F.2d at 1419. Whether or not Ms. Rice was armed with sufficient information before April 23, 1991 becomes a central question in determining the extent of her duty of inquiry.

■ Defendant argues strenuously that *Arvayo* requires Plaintiff's action to be barred. Its argument is strong but ultimately unpersuasive. *Arvayo,* as well as the cases upon which it relies, is importantly different than the case at bar, because the facts surrounding the injury in that case gave rise to a clear inference that the injury could be traced to the treatment provided. Although *Kubrick* plainly stated that accrual under the FTCA does not await knowledge of *negligence,* accrual does require that a reasonable person would link the injury suffered to the treatment received. At the very least, a reasonable person should be prompted to inquire into such a link before the two-year clock begins to tick.

In *Arvayo, Gustavson,* and *Kubrick,* the courts said a reasonable person would have made such a causal connection. However, the plaintiffs in those case had much more of the relevant knowledge of causation than Ms. Rice possessed by April 23, 1991. In *Arvayo,* plaintiffs brought their five-month old son to the Air Force base hospital complaining of crankiness and fever. A doctor there diagnosed the problem as an upper respiratory infection. One day later, the infant was brought back to the base hospital and was diagnosed with bacterial meningitis. Almost three years later, the Arvayos filed their complaint. Given the contradictory diagnoses, the Tenth Circuit emphasized the duty to inquire into cause, i.e. the facts surrounding the original misdiagnosis and the potential for negligence.

*Arvayo* cited heavily from *Gustavson,* a case in which the Tenth Circuit upheld a district court's granting of summary judgment based on the statute of limitations clause in the FTCA. In *Gustavson,* the child had a severe bedwetting problem for which

he occasionally was seen by military doctors. The doctors attributed the problems to anxiety rather than vesico-ureteral reflux, a disorder that could be corrected by surgery. In 1973, the plaintiff consulted a civilian doctor who informed the plaintiff that an operation should have been done before and that his kidneys had been damaged by the long-continued reflux. *Gustavson,* 655 F.2d at 1036. Plaintiff filed his complaint in 1977, and the court found the claim time-barred. In *Gustavson,* the plaintiff knew, as early as 1973, that there was a potential link between the injury suffered, kidney damage, and the treatment he received from military doctors.

Finally, the facts involved in the Supreme Court's decision in *Kubrick* deserve consideration. Kubrick was a veteran who, following surgery in 1968, was given neomycin. Approximately, six weeks after discharge, Kubrick noticed deafness. One ear specialist informed Kubrick in January of 1969 that it was highly possible that the hearing loss stemmed from the neomycin treatment administered at the hospital in 1968. Kubrick did not file an action under the FTCA until 1972. The Supreme Court rejected the theory that accrual of a claim must await awareness that his injury was negligently inflicted. Instead, the Court held, "A plaintiff such as Kubrick, armed with the facts about the harm done to him, can protect himself by seeking advice in the medical and legal community." 444 U.S. at 123, 100 S.Ct. at 360. The claim accrued in January of 1969, triggered by his understanding that the deafness was related to the neomycin treatment.

In all three of the above-discussed cases, the injured parties were given critical information linking the injury suffered and the actions or omissions of medical personnel. With these facts, the courts have considered the parties appropriately armed to determine whether a cause of action under the FTCA existed.

■ The question as to whether the Plaintiff was reasonably diligent is an objective inquiry. *Arvayo,* 766 F.2d at 1422. In *Arvayo,* the court held:

> The question is simply whether a reasonable person in the Arvayos' position, with the knowledge of two drastically different

diagnoses in a twenty-four hour period, with the concomitant likelihood of brain damage, would have made *some* type of inquiry.

*Id.* The issue here is whether it was unreasonable, under the circumstances, for Ms. Rice not to know or inquire about a potential relationship between the injury suffered and actions or omissions by doctors and nurses at CIH before she met with Dr. Cooper. The Court must adopt an objective approach to Ms. Rice's actions and beliefs. Her stated subjective belief in the hereditary nature of Markus' problems is not sufficient to toll the statute of limitations. Her actions must still meet a test of reasonableness.

In this case, unlike those discussed above, the circumstances would not necessarily lead a reasonable person to question the representations made to her by physicians and medical personnel. If Ms. Rice repeatedly asked and was repeatedly told only that Markus was born with breathing problems, she might reasonably have believed that there were no unusual events surrounding Markus' birth. Nothing took place so out of the ordinary at CIH or at Saint Francis that would have aroused Ms. Rice's suspicions. True, the seriousness of the injury was extraordinary. However, she was not put on notice in any way that Markus' ailments were related to any action or omission traceable to personnel at CIH. In fact, she reasonably interpreted comments made to her by such personnel to mean that Markus' problems were entirely unrelated to treatment at CIH and were, in fact, hereditary. Except when a plaintiff should have reasonably suspected negligence, courts have allowed patients to rely on assurances by physicians that complications are normal. *Rosales v. United States,* 824 F.2d 799, 805 (9th Cir.1987). It is not a subjective analysis of Ms. Rice's state of mind to note the objective effect created by statements of medical personnel. When a doctor reports that a person is "born with" a problem, it could reasonably have the effect of leading a person to believe that the injury was completely unavoidable.

Defendant argues that evidence in the medical records demonstrates that Ms. Rice possessed adequate information to inquire

into causation, pointing to the fact that she knew Markus aspirated or swallowed meconium. However, assuming Ms. Rice did know that Markus inhaled or swallowed meconium, this does not necessarily demonstrate the knowledge required under the statute. Given that she was told that Markus was born with his problem and the absence of circumstances suggesting any connection between the injury and the treatment received, Ms. Rice could reasonably have assumed that Markus' condition was unavoidable. Nothing occurred prior to Ms. Rice's meeting with Dr. Cooper to indicate that meconium aspiration *relating to care at CIH* caused the injuries to Markus. According to Ms. Rice, she was simply told that Markus was born with a breathing problem.

Even if Ms. Rice was told that meconium aspiration "caused" the disorder, this is not the notion of "cause" contemplated by the statute and interpreted in *Arvayo*. After all, the important aspect of causation in *Arvayo* was not meningitis. The plaintiffs knew of meningitis immediately after the diagnosis was made. The cause referred to and discussed extensively in the decision was the fact that meningitis was not diagnosed earlier, reflecting the importance of linking the injury to treatment. Similarly, the aspect of causation referred to in *Gustavson* involved the injury caused by the failure to proceed with surgery at an earlier time. In *Kubrick*, the element of causation important to the Court was the knowledge that neomycin treatment may have played a role in the plaintiff's deafness. A close reading of the language in *Kubrick* highlights this nexus. The Court said, "A plaintiff such as Kubrick, armed with the facts about the *harm done to him*, can protect himself by seeking advice in the medical and legal community." 444 U.S. at 123, 100 S.Ct. at 360 (emphasis added). This passage reflects the Court's requirement that the plaintiff knows he or she was harmed in some way by the treatment received.

There is no direct evidence that Ms. Rice was ever told of or had reason to suspect a potential relationship between the injury and the treatment Markus received. For instance, there is no letter from a physician describing Markus' malady. In this way, the case is unlike *Nemmers v. United States,* 795 F.2d 628, 630 (7th Cir.1986), where the parents received a letter from a physician that would have prompted a reasonable person to conduct further investigation.

This Court does not interpret the FTCA and the cases arising from it to mandate that knowledge of injury is sufficient, by itself, to require further inquiry into cause and negligence. To do so would "completely bypass and obliterate the second requirement" of *Kubrick* requiring knowledge of cause before the limitations period begins to run. *Mendez v. United States,* 655 F.Supp. 701, 708 (S.D.N.Y.1987). Such a requirement would force all those who suffered pain or illness or death in a government hospital to investigate all the records to determine whether the harm may have been caused by hospital staff. *Id; Drazan v. United States,* 762 F.2d 56, 59 (7th Cir.1985). If the individual did not make such an investigation, following each and every hospitalization or treatment, he or she would risk loss of all potential tort claims implicating the government hospital.

Therefore, this Court holds that sufficient details have not been presented to show that Ms. Rice was armed with the necessary facts to determine the cause, as understood under the caselaw pursuant to *Kubrick,* of the injuries sustained by Markus. If such a showing is made at trial, the Court would be required to award a dismissal of the Complaint. The applicability of the statute of limitations turns on the resolution of issues of fact and credibility of key witnesses. The Court at this point is not prepared to make such a determination.

## IV. Conclusion

For the reasons discussed above, the Motion for Summary Judgment is denied.