Michael **ASHCROFT**, Plaintiff,

v.

Jonathan **RANDEL**, Defendant.

Civil Action No. 1:03–CV–3645–RWS.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 30, 2005.

Michael P. Kenny, Christina Hull Eikhoff, Alston & Bird, Richard Brooks Holcomb, Federal Defender Program, Inc., Atlanta, GA, for Plaintiff.

Roy E. Barnes, John Frank Salter, The Barnes Law Group, LLC, Marietta, GA, for Defendant.

## *ORDER*

STORY, District Judge.

This case is before the Court for consideration of Defendant's Motion to Dismiss [13] which was converted into a Motion for Summary Judgment by Order of this Court [23]; Plaintiff's Motion to File Oversize Opposition [14]; and Plaintiff's Motion for Extension of Time to Respond to Defendant's Motion to Dismiss [18]. After considering the entire record, the Court enters the following Order.

Plaintiff's Motion to File Oversize Opposition [14] and Plaintiff's Motion for Extension of Time [18] are hereby **GRANTED** *nunc pro tunc.*

### Background

Plaintiff, a citizen of both the United Kingdom and Belize, is a prominent businessman, member of the British Parliament, and former Belizean Ambassador to the United Nations.[1] (First Am. Compl.

---

1. Because Defendant's Motion to Dismiss was converted into a Motion for Summary Judgment by Order of the Court, no statement of undisputed facts or responses thereto have been filed. Therefore, the facts as provided here are taken from (1) the undisputed allega-

¶¶ 1, 5.) Defendant is a former Intelligence Research Specialist employed by the Drug Enforcement Agency ("DEA") in its Atlanta Field Division office. (First Am. Compl. ¶¶ 1, 13.) Over a period of six months, from February to July 1999, Defendant illegally obtained and leaked sensitive information related to Plaintiff from the DEA's Narcotics and Dangerous Drug Information System database ("NADDIS"). (First Am. Compl. ¶¶ 1, 10, 13.) With the assistance of Toby Follett, a freelance British journalist, this leaked information was eventually conveyed to the *Times of London* and subsequently used in a series of stories regarding Plaintiff and his possible involvement in drug trafficking. (First Am. Compl. ¶¶ 1, 2, 13, 15, 16.) In 1999, soon after the publication of these stories, Plaintiff filed suit against the *Times of London* for libel in the courts of the United Kingdom (the "United Kingdom litigation"). (First Am. Compl. ¶¶ 2, 20 .) Through the United Kingdom litigation, Plaintiff was able to obtain copies of the leaked documents which served as the basis for the stories. (Akagi Aff. ¶ 2.)

In late 1999, Tony Bocchichio, a former DEA employee, contacted the DEA on behalf of Plaintiff and informed the DEA that Plaintiff had obtained copies of the leaked documents. (Akagi Aff. ¶ 2.) On December 8, 1999, Mr. Bocchichio met with DEA Inspectors and provided the DEA with copies of those documents. (Akagi Aff. ¶ 3.) Approximately two days later, a DEA computer specialist conducted an internal audit of DEA databases in an effort to ascertain who within the agency had accessed the leaked documents. (Akagi Aff. ¶ 4.) This audit revealed that an account number assigned to Defendant was the only one to have accessed one of the documents leaked to the *Times of London*. (Akagi Aff. ¶ 4.) By late June 2000, DEA investigators considered Defendant to be a "strong suspect." (Akagi Aff. ¶ 4.) In January 2001, he was considered to be the primary suspect in the leak. (*Id.*)

Whatever level of certainty the DEA possessed regarding Defendant's involvement in the leak, by April 2000 Mr. Bocchichio was informed that Defendant's name had surfaced in the DEA's investigation as a possible suspect. (Kilkenny Decl. at 1.) This information was provided to other members of Plaintiff's "team" and incorporated into a letter from Plaintiff's British counsel, David Hooper, in which Plaintiff complained of the *Times of London's* failure to abide by a settlement agreement reached in the United Kingdom litigation. (*See* Kilkenny Decl. at 1–2.) In that letter, dated May, 12, 2000, Plaintiff threatened to initiate litigation against Defendant by name. (*See* May 12 Letter at 2.)

On July 10, 2001, Defendant was indicted in the Northern District of Georgia in a one count, five paragraph indictment for violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4). (Crim. Indict., Count One, *United States v. Ran-*

tions of the First Amended Complaint [4], and where disputed, the allegations most favorable to Plaintiff as non-movant; (2) the letter dated May 12, 2000, from David Hooper, counsel for Plaintiff, to Alastair Brett, counsel for the Times Newspapers Ltd. (the "May 12 Letter"), attached as an Exhibit to Defendant's Motion to Dismiss and the authenticity of which Plaintiff does not dispute; (3) the uncontradicted testimony contained in the transcript of the August 2002 testimony of James T. Akagi (the "Akagi Testimony Tran-

script") attached as an Exhibit to Defendant's Motion to Dismiss; and (4) the uncontradicted testimony contained in the affidavit of James T. Akagi (the "Akagi Affidavit") submitted by Plaintiff in opposition to Defendant's Motion for Summary Judgment; and (5) the uncontradicted testimony contained in the declaration of Alan Kilkenny (the "Kilkenny Declaration") submitted by Plaintiff in opposition to Defendant's Motion for Summary Judgment.

*del,* No. 1:01–cr–512–RWS (N.D.Ga. July 10, 2001) [hereinafter First Indictment].) The indictment alleged that: (1) Defendant "was an Intelligence Research Specialist for the [DEA], who was assigned to the Atlanta Field Division"; (2) Defendant "accessed two documents derived from NADDIS and disclosed the contents of the documents to include restrictive narrative reports to unauthorized individuals"; (3) Defendant "received compensation for the unauthorized disclosure of restrictive information"; and (4) "[i]n or about March 1999 through in or about July 1999, . . . the defendant, JONATHAN RANDEL, knowingly and with intent to defraud, accessed . . . a protected computer . . . and by means of such conduct, furthered the intended fraud and obtained something of value. . . ." (First Indictment ¶¶ 1, 3–5.) On November 29, 2001, a superceding indictment was filed adding counts for conversion of public property in violation of 18 U.S.C. § 641, and wire fraud in violation of 18 U .S.C. §§ 1343, 1346. (Superceding Indict., *United States v. Randel,* No. 1:01–cr–512–RWS (N.D.Ga. Nov. 29, 2001)). On June 4, 2002, Defendant plead guilty to one count of conveying records of the United States in violation of 18 U.S.C. § 641 and was sentenced to 12 months in prison.

On November 28, 2003, Plaintiff filed suit seeking recovery both under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), for violations of his Fourth and Fifth Amendment rights. Defendant moved to dismiss the complaint under Rule 12(b)(6) as untimely and barred by the applicable statutes of limitation. Plaintiff responded that whether Plaintiff's claims were barred by the statutes of limitation was a question of fact. By an Order dated May 31, 2005, this Court converted Defendant's Motion to Dismiss into a Motion for

Summary Judgment on the sole question of whether the statute of limitations bars Plaintiff's claims. *See* FED.R.CIV.P. 12(b).

**Discussion**

**I. Summary Judgment Standard**

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.' " *Hickson Corp. v. N. Crossarm Co., Inc.,* 357 F.3d 1256, 1259 (11th Cir.2004) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) (internal quotations omitted). Where the moving party makes such a showing, the burden then shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The applicable substantive law identifies which facts are material. *Id.* at 248, 106 S.Ct. 2505. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. *Id.* An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 249–50, 106 S.Ct. 2505.

In determining a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the

light most favorable to the non-moving party. *Patton v. Triad Guar. Ins. Corp.*, 277 F.3d 1294, 1296 (11th Cir.2002). But, the court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted); *see also Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348 (once the moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts.").

The statute of limitations is an affirmative defense. FED.R.CIV.P. 8(c). As such, the party asserting a statute of limitations defense bears the burden of showing that the defense is applicable. *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1552 (11th Cir.1990); *Harrison v. Thompson*, 447 F.2d 459, 460 (5th Cir. 1971) (per curiam). At the summary judgment stage, the moving party must show that there is no genuine issue of material fact as to whether the statute of limitations has run. That is to say, the moving party must establish that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Allen*, 121 F.3d at 646. Once the moving party shows that the applicable statute of limitations bars the claim, the burden shifts to the non-moving party to demonstrate that an exception or tolling provision applies. *Blue Cross & Blue Shield of Ala.*, 913 F.2d at 1552 n. 13; *see also Campbell v. Grand Trunk W.R. Co.*, 238 F.3d 772, 775 (6th Cir.2001) ("Because the statute of limita-tions is an affirmative defense, the burden is on the defendant to show that the statute of limitations has run. If the defendant meets this requirement then the burden shifts to the plaintiff to establish an exception to the statute of limitations.").

## II. Applicable Statute of Limitations

### A. Bivens claims

 The limitation period for *Bivens* actions is borrowed from the state limitation period applicable to personal injury actions. *Kelly v. Serna*, 87 F.3d 1235, 1238 (11th Cir.1996); *see also Wilson v. Garcia*, 471 U.S. 261, 277, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985) (holding state statutes of limitation for personal injury are applicable to claims under 42 U.S.C. § 1983). As such, the Georgia two-year personal injury limitations period applies to *Bivens* actions in a Georgia district court. *Mullinax v. McElhenney*, 817 F.2d 711, 716 n. 2 (11th Cir.1987); *see* O.C.G.A. § 9–3–33.

 The statute of limitations begins to run when the cause of action accrues. *Uboh v. Reno*, 141 F.3d 1000, 1002 (11th Cir.1998). Although the limitations period is borrowed from state law, accrual of a cause of action under *Bivens* is determined as a matter of federal law. *See Kelly*, 87 F.3d at 1238–39 (accrual of § 1983 claim is a matter of federal law); *Mullinax*, 817 F.2d at 716 (same). Under the federal "discovery rule," a claim accrues when the injured party knew or should have known both (1) that he has suffered the injury that forms the basis of his complaint and (2) who inflicted that injury. *Chappell v. Rich*, 340 F.3d 1279, 1283 (11th Cir.2003); *Mullinax*, 817 F.2d at 716. The statute of limitations clock begins to run when "the facts which support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Rozar v. Mullis*, 85 F.3d 556,

561–62 (11th Cir.1996) (quoting *Mullinax*, 817 F.2d at 716).

### B. Computer Fraud and Abuse Act claim

The Computer Fraud and Abuse Act contains a statute of limitations provision. The Act provides: "No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage." 18 U.S.C. § 1030(g). The parties appear to agree that the discovery rule applies and "that the statute of limitations was triggered as soon as Plaintiff became aware or should have been aware who has inflicted the injury." (Def.'s Reply in Supp. of Mot. for Summ. J. [32] at 8) (internal quotations omitted).[2]

### C. Timeliness of Plaintiff's action

Defendant has moved for summary judgment on the grounds that the Plaintiff's action is untimely and barred by the two-year statute of limitations applicable to all claims. Accordingly, this Court must determine whether it is clear, as a matter of law, that Plaintiff's claims accrued more than two years before this action was initiated. The Court concludes that it is.

■ Plaintiff's complaint was filed on November 28, 2003. Therefore, to be timely, Plaintiff's claims must have accrued on or after November 28, 2001. Under the federal discovery rule, Plaintiff's claims accrued when he either knew or should have known both (1) that he has suffered the injury that forms the basis of his complaint, and (2) that Defendant inflicted that injury. *Chappell*, 340 F.3d at 1283; *Mullinax*, 817 F.2d at 716. In assessing whether Plaintiff should have known of his claim, the Court must determine whether facts sufficient to support a cause of action were or should have been apparent "to a person with a reasonably prudent regard for his rights." *Rozar*, 85 F.3d at 561–62 (quoting *Mullinax*, 817 F.2d at 716).

As evidenced by Plaintiff's 1999 libel suit in the United Kingdom, Plaintiff was well-

---

**2.** The Court notes that it is not clear, as the parties appear to agree, that accrual of a cause of action under § 1030 is governed by the federal discovery rule as applied by the Eleventh Circuit Court of Appeals. That is to say, it is not clear from the text of the statute that a cause of action does not accrue until the plaintiff knew or should have known both that he has suffered an injury and who inflicted that injury. *See Chappell*, 340 F.3d at 1283.

Section 1030(g) provides that an action must be brought "within 2 years of the date of the act complained of or the date of the discovery of the damage." 18 U.S.C. § 1030(g). In other contexts, where Congress has intended that the statute of limitations not begin to run until the plaintiff knew or should have known of both the injury and its cause, it has expressly said so. *See* 42 U.S.C. § 9612(d)(2) (claims for recovery of damages may be made within three years after the "date of the discovery of the loss and its connection with the release in question"); 42

U.S.C. § 2210(n)(2) (providing for indemnity agreements that waive any issue or defense based upon the statute of limitations "if suit is instituted within three years from the date on which the claimant first knew, or reasonably could have known, of his injury or damage and the cause thereof"). In light of the plain language of both § 1030 and other congressionally formulated limitation periods, it is conceivable "that Congress said what it meant and meant what it said," *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir.2001), and simply did not see fit to require that a plaintiff have knowledge of the cause of his damage before a claim accrues under § 1030. But, because the Court concludes that Plaintiff's claim is barred under the more permissive federal discovery rule whereby the statute of limitations runs from the date that Plaintiff knew or should have known of both the injury and its cause, the Court need not decide this issue here.

aware that he had suffered an injury. Thus, the issue for the Court to decide on summary judgment is whether Plaintiff knew or should have known of Defendant's role in causing that injury prior to November 2001. To establish Plaintiff's knowledge, either actual or constructive, Defendant relies on: (1) the 1999 publication of the allegedly libelous articles by the *Times of London*; (2) Plaintiff's involvement in the DEA investigation, namely the testimony of DEA Inspector James Akagi in which he refers to certain meetings occurring in late 1999 between Plaintiff's representatives and the DEA; (3) the May 12, 2000 letter from David Hooper, counsel for Plaintiff, to Alastair Brett, counsel for Times Newspapers Ltd., in which Plaintiff threatens litigation against Defendant by name; and (4) Defendant's July 10, 2001 indictment. The Court addresses each in turn, turning first to whether Plaintiff had actual knowledge of Defendant's role in causing his injury, and then looking to whether Plaintiff had constructive knowledge of such involvement.

### 1. Plaintiff's actual knowledge of Defendant's involvement

Defendant argues that Plaintiff had actual knowledge of Defendant's involvement in the leak more than two years prior to filing his complaint. Defendant's argument is based primarily on Plaintiff's involvement in the DEA investigation, Plaintiff's May 12, 2000 threat to bring legal action against Defendant, and Defendant's July 2001 indictment. In contrast, Plaintiff contends that he lacked actual knowledge that Defendant was the cause of his injury until August 2002 when Inspector Akagi testified as to Defendant's full role in leaking the documents. As explained below, the Court concludes that Defendant has not established, as a matter of law, that Plaintiff had actual knowledge of his role in causing Plaintiff's injury.

### a. The 1999 publication by the Times of London

■ As an initial matter, the Court addresses the effect of the 1999 publication of the allegedly libelous articles by the *Times of London* on the running of the statute of limitations. The publication certainly made Plaintiff aware of his injury. But, under the federal discovery rule, Plaintiff's cause of action did not accrue until Plaintiff either knew or should have known of both his injury and its cause. As Plaintiff correctly points out, Plaintiff's knowledge that the published articles were based on information obtained from the DEA does not, in and of itself, establish that he had knowledge of Defendant's involvement. There is nothing to indicate that the articles in any way made reference to the source of the documents within the DEA, much less to Defendant. Therefore, under the discovery rule, the publication of the allegedly libelous articles in 1999 was insufficient, in isolation, to start the running of the statute of limitations clock.

### b. Plaintiff's communications with the DEA, threats to initiate litigation, and the July 10, 2001 indictment

■ To establish that Plaintiff had actual knowledge of Defendant's involvement in the leak, Defendant relies on the fact that Plaintiff was "working with DEA to pursue and prosecute [Defendant] by October 1999, and his attorneys were openly threatening to sue [Defendant] and *The Times* ... by May 2000." (Def.'s Mot. to Dismiss at 5, 7.) Thus, according to Defendant, one may infer from the allegedly close relationship between Plaintiff and the DEA that Defendant's identity as the source of the documents was conveyed to Plaintiff and this inference is confirmed by Plaintiff's May 2000 threat to sue Defendant by name. But, neither the relation-

ship between Plaintiff and the DEA nor the May 12, 2000 letter, either by itself or in combination, establishes as a matter of law that Plaintiff had actual knowledge of Defendant's involvement in the leak prior to November 2001.

First, the relationship between Plaintiff and the DEA does not establish that Plaintiff knew of Defendant's identity as the source of the leaked documents prior to November 2001. It is undisputed that Plaintiff and/or his employees were in communication with the DEA during its investigation into the leak. It was, after all, Plaintiff himself who, through his agent Mr. Bocchichio, assisted the DEA by providing copies of the leaked documents in question. It is also undisputed that as late as April 2000, Plaintiff's agent, Mr. Bocchichio, had knowledge that, at a minimum, the DEA considered Defendant to be a possible suspect in the leak. (Kilkenny Decl. at 1.) As Mr. Kilkenny states in his declaration:

> In or about April 2000, Mr. Bocchichio told me by telephone that the DEA's investigations had given rise to certain suspicions that included an employee called Jonathan Randel. Beyond the transmission of this name as a possible suspect, Mr. Bocchichio was unable to provide further information about Mr. Randel or his possible involvement in the *The Times'* [sic] acquisition of the DEA documents.

But, Plaintiff's precise role in the investigation, and what information, if any, was communicated to Plaintiff by the DEA remains unclear. Defendant has produced no evidence establishing either the precise nature of Plaintiff's involvement in the investigation or the substance of any communications with the DEA. Although Defendant has submitted the testimony of Inspector Akagi in which he refers to certain meetings between the DEA and Plaintiff's representatives, (*see* Akagi Test. Tr.

at 46–52), that testimony does not establish that the DEA informed Plaintiff that Defendant was the source of the leaked documents. Furthermore, that Plaintiff knew that the DEA's investigations had given rise to "certain suspicions" about Defendant does not establish that Plaintiff knew with any certainty that Defendant was responsible for his injury. Finally, Inspector Akagi avers that, despite the fact that DEA investigators were able to ascertain by December 1999 that Defendant's account was the only one to have accessed at least one of the leaked documents, he was not considered a "strong suspect" until the end of June 2000 and was not considered the "primary suspect" until January 2001. (Akagi Aff. ¶ 4.) That the DEA had not determined with any certainty that Defendant was the source of the documents tends to rebut Defendant's assertion that his identity as the leaker was definitively conveyed to Plaintiff.

Second, the May 12, 2000 letter in which Plaintiff's attorneys directly threaten Defendant with litigation does not establish that Plaintiff had knowledge of his involvement sufficient to start the statute of limitations clock. Certainly, a direct reference to Defendant is strong evidence that Plaintiff was aware of Defendant's involvement. But, Plaintiff has come forward with evidence tending to show that the letter's reference to Defendant was not based on specific knowledge that Defendant was responsible for leaking the DEA documents. In his declaration, Mr. Kilkenny, who was involved in the preparation of the May 12, 2000 letter, states:

> [I]n drafting the letter, the decision to reference [Defendant] was a calculated risk based on no supporting evidence and in respect of two individuals about whom little was known at that stage . . . [T]he use of th[e] name[ ] . . . Jonathan Randel . . . was nothing more than a "shot in the dark" in the hope that [it]

might mean more to *The Times* than [it] did to the Ashcroft team. If the shot was even vaguely on target, it was hoped to frighten, and thus, discourage further aberrant behaviour. It did not in any way evidence that Mr. Ashcroft, or his advisors such as myself, knew any detail about his activities, in particular his involvement in the DEA documents as transpired some considerable time later.

Although the inclusion of Defendant's name is certainly probative of Plaintiff's knowledge, it cannot be said, at this stage of the litigation, that it unequivocally establishes actual knowledge that Defendant was the source of Plaintiff's injury.

Finally, the July 10, 2001 indictment does not establish that Plaintiff had actual knowledge of Defendant's involvement in the leak. It is true that Defendant's indictment precedes the filing of this action by more than two years. It is also true that the indictment clearly references the misappropriation of NADDIS files, the illegal disclosure of their contents to unauthorized individuals, and states that the illegal acts occurred between approximately March and July 1999, a time period which coincides with the July 1999 publication of the articles in the *Times of London.* But, nothing on the face of the indictment evidences that Plaintiff had actual knowledge that Defendant was the cause of his injury.

To be sure, the evidence submitted by Plaintiff is hardly the most probative available. Regarding Inspector Akagi's statement that he is "aware of no instance in which Mr. Randel's identity was disclosed to anyone outside of the DEA, the United States Attorney's Office ... and the grand jury ... between approximately December 10, 1999 ... and July 10, 2001," (Akagi Aff. ¶ 5), such a statement is of little value. By Inspector Akagi's own admission, he was not assigned to the investigation until March 2001 (Akagi Aff. ¶ 1), and lacks

firsthand knowledge of whether the DEA provided any information to Plaintiff prior to his assignment. (Akagi Test. Tr. at 49.) Furthermore, and quite notably, Plaintiff does not provide an affidavit from Mr. Bocchichio, his employee who was in active communication with the DEA, or himself stating precisely what Plaintiff knew and when. Certainly, either would be in a far better position to clarify for the Court that Plaintiff lacked actual knowledge of Defendant's involvement.

Additionally, the Court notes that there are indications that Plaintiff may have known more than the affidavits submitted on his behalf state. For example, in the May 12, 2000 letter, Plaintiff's attorney stated:

> I am instructed to inform you that, should such a breach be repeated, my client will sue for breach of contract. In addition, he will bring ... two new actions, preparation of which in the spirit of the settlement agreement was suspended.

> The first to be brought in the United States will be against, among others, Times Newspapers, Ltd., Dr. Jonathan Randel and Toby Follett....

(May 12 Letter at 2.) This statement is telling for two reasons. First, it clearly indicates that as of May 2000, preparation for litigation against the named individuals was already underway. Second, the threat was directed at both Defendant and Toby Follett, the freelance journalist who served as a conduit for the leaked documents. That Plaintiff was aware, not only of Defendant's possible involvement in the leak, but also the very means by which he came into contact with the *Times* and conveyed the documents, calls into question Plaintiff's claim that naming Defendant was a mere " 'shot in the dark' in the hope that [it] might mean more to *The Times* than [it] did to the Ashcroft team."

Nevertheless, at the summary judgment stage the Court must view all evidence and draw all reasonable inferences in the light most favorable to Plaintiff. *Patton v. Triad Guar. Ins. Corp.*, 277 F.3d 1294, 1296 (11th Cir.2002). When the evidence is viewed in this light, the Court concludes that Defendant has not established the absence of any genuine issue of material fact as to whether Plaintiff had actual knowledge of Defendant's role in causing his injury prior November 2001. As such, the only issue to be resolved is whether Plaintiff should have known that the Defendant was the cause of that injury before November 28, 2001.

### 2. Plaintiff's constructive knowledge of Defendant's involvement

 Under the federal discovery rule, Plaintiff's cause of action is deemed to have accrued when Plaintiff knew or should have known both of his injury and its cause. *Chappell*, 340 F.3d at 1283; *Mullinax*, 817 F.2d at 716. The statute of limitations clock began to run when "the facts which support a cause of action ... should be apparent to a person with a reasonably prudent regard for his rights." *Rozar*, 85 F.3d at 561–62 (quoting *Mullinax*, 817 F.2d at 716). The standard to be applied under the discovery rule is an objective one. *Cascone v. United States*, 370 F.3d 95, 104 (1st Cir.2004); *Attallah v. United States*, 955 F.2d 776, 780 (1st Cir. 1992); *Arvayo v. United States*, 766 F.2d 1416, 1422 (10th Cir.1985); *Rice By and Through Rice v. United States*, 889 F.Supp. 1466, 1471 (N.D.Okla.1995); *Lawrence v. Jackson Mack Sales, Inc.*, 837 F.Supp. 771, 782 (S.D.Miss.1992). "A claim does not accrue when a person has a mere hunch, hint, suspicion, or rumor of a claim, but such suspicions do give rise to a duty to inquire into the possible existence of a claim in the exercise of due diligence." *McIntyre v. United States*, 367 F.3d 38, 52 (1st Cir.2004) (quoting *Kronisch v. United States*, 150 F.3d 112, 121 (2d Cir.1998); *see also Hobson v. Wilson*, 737 F.2d 1, 35 (D.C.Cir.1984), *overruled on other grounds*, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). "Once a duty to inquire is established, the plaintiff is charged with the knowledge of what he or she would have uncovered through a reasonably diligent investigation." *McIntyre*, 367 F.3d at 52. A claim is deemed to accrue when, if armed with the results of that investigation, a reasonable person would know that he had been injured and that there is a causal connection between the defendant and his injury. *Chappell*, 340 F.3d at 1283; *McIntyre*, 367 F.3d at 52; *Skwira v. United States*, 344 F.3d 64, 78 (1st Cir.2003). Although accrual under the discovery rule is generally a question for the jury, it may become one for the court if the relevant facts are undisputed and only one conclusion can be drawn from them. *See, e.g., Cathedral of Joy Baptist Church v. Village of Hazel Crest*, 22 F.3d 713, 719 (7th Cir.1994).

 Based on the undisputed facts, the Court concludes that Plaintiff's claim accrued under the federal discovery rule, at the latest, on July 10, 2001 when the criminal indictment was issued. At that point, the facts which support a cause of action were apparent or should have been apparent to a person with a reasonably prudent regard for his rights. *Rozar*, 85 F.3d at 561–62 (quoting *Mullinax*, 817 F.2d at 716).

Plaintiff in this case was aware that a series of allegedly libelous articles linking him to drug trafficking and money laundering was published in the *Times of London* in July 1999. (First Am. Compl. ¶¶ 2, 16.) Plaintiff was also aware that these articles were based upon leaked documents obtained from a DEA database. (Akagi Aff. ¶ 3.) In fact, Plaintiff went so far as to employ Mr. Bocchichio, himself a

former DEA officer, to authenticate the alleged DEA documents and to offer an interpretation of them. (Kilkenny Decl. at 1.) By April 2000, Plaintiff was aware that the DEA considered Defendant to be a possible suspect in its investigation into the leaked documents. (Kilkenny Decl. at 1.) This knowledge is confirmed both by Mr. Kilkenny's declaration itself and by the May 12, 2000 letter in which Plaintiff threatened civil action against Defendant by name. (May 12, 2000 letter at 2.) At that point, Plaintiff was under a duty to conduct a reasonably diligent investigation into the possible existence of a claim against Defendant. *McIntyre*, 367 F.3d at 52.

Without question, any suspicions Plaintiff harbored against Defendant should have been confirmed by the July 10, 2001 indictment. The indictment clearly stated that Defendant, a DEA employee, was charged with leaking sensitive documents from the restricted DEA NADDIS database; that the database from which the documents were derived was used for coordination of intelligence and background information on narcotics traffickers; that Defendant conveyed these documents to unauthorized individuals for compensation; and that the leaks occurred between March 1999 and July 1999, a time that coincided with the publication of the allegedly libelous articles in the *Times of London*. Each of these facts corresponds directly to information that was known by Plaintiff more than a year before. In short, a person with a reasonably prudent regard for his rights, and armed both with the facts in the possession of the Plaintiff and those contained in the indictment, would have known that Defendant was the cause of his injury. As such, Plaintiff's claim accrued as a matter of law when the indictment was made public.

█ As Defendant correctly points out, there is ample authority supporting the proposition that an indictment arising out of the same acts upon which a plaintiff's claim is based provides notice sufficient to start the statute of limitations clock under the federal discovery rule. *See F.D.I.C. v. Wabick*, 214 F.Supp.2d 864, 877 (N.D.Ill. 2002) ("Even with the benefit of the discovery rule on the most generous assumption (with time measured from the return of the criminal indictment), FDIC's fraud claims are time-barred...."); *Schock v. United States*, 21 F.Supp.2d 115, 120 (D.R.I.1998) ("At a minimum, the claims accrued when plaintiff knew [that his former attorney] had been indicted for financial irregularities."); *cf. Attallah*, 955 F.2d at 780 ("[W]e find that the principles established by the discovery rule warrant a delayed accrual in this case since [the plaintiffs] did not know, nor in the exercise of reasonable diligence could have known of the Customs agents' criminal acts until the time of their indictment...."). But, the Court stresses that it was not Defendant's indictment, in and of itself, which put Plaintiff on notice of his potential claim. Rather, it was the *content* of the indictment which, when considered in light of what was already known by Plaintiff, provided Plaintiff with facts sufficient for a person with reasonably prudent regard for his rights to conclude that Defendant was the cause of his injury.

Finally, the Court addresses Plaintiff's contention that courts are "reluct[ant] to start the statute of limitations clock on the mere filing of a criminal indictment." (Pla.'s Opp'n to Mot. for Summ. J. [30–1] at 14.) Assuming this to be true, the Court finds the Tenth Circuit's opinion in *Allred* and its application of the Utah discovery rule to a case with most extraordinary facts unpersuasive. As the Court made clear above, it was not the indictment per se, but rather the contents of the

indictment when considered in light of facts already within Plaintiff's knowledge, which started the statute of limitations clock. On these facts, the Court finds the policies of preventing stale claims and encouraging "the proper diligence which statutes of limitation were intended to insure," *see Justice v. United States*, 6 F.3d 1474, 1479 (11th Cir.1993), justify application of the statute of limitations to Plaintiff's claims.

In sum, from Plaintiff's own affidavits, it is clear that Plaintiff was at least aware of Defendant's possible involvement in the leak as late as April 2000. Any suspicions Plaintiff may have had about Defendant should have been resolved by his July 10, 2001 indictment. Plaintiff had two full years from that date to determine the purported facts underlying his claims and to file his complaint. Instead, Plaintiff waited until November 28, 2003, at which time the statute of limitations had already run. Therefore, unless the doctrine of equitable tolling applies, Plaintiff's claims are barred under the applicable two-year statute of limitations.

### D. Equitable tolling

 Plaintiff asserts that even if his claims are untimely under the discovery rule, genuine issues of material fact exist as to whether the doctrine of equitable tolling should apply. (Pla.'s Opp'n to Mot. for Summ. J. [30–1] at 16.) The Eleventh Circuit has made clear that equitable tolling is an extraordinary remedy which should be extended only sparingly. *Justice v. United States*, 6 F.3d at 1479. The burden is on the plaintiff to establish that equitable tolling is warranted. *Bost v. Federal Express Corp.*, 372 F.3d 1233, 1242 (11th Cir.2004); *Justice*, at 1479; *Ross v. Buckeye*, 980 F.2d 648, 661 (11th Cir.1993).

As the Eleventh Circuit has recognized, the doctrine of equitable tolling seeks to balance two diametrically opposed concepts related to statutes of limitation.

On the one hand, statutes of limitations protect defendants, "promot[ing] justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." Moreover, the courts ought to be relieved of the burden of trying stale claims when a plaintiff has slept on his rights.

*Justice*, 6 F.3d at 1479 (quoting *Burnett v. New York Cent. R. Co.*, 380 U.S. 424, 428, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965)). "On the other hand, these concerns may be outweighed when the interests of justice require that a plaintiff's rights be vindicated ." *Justice*, 6 F.3d at 1479.

As the Eleventh Circuit has explained, equitable tolling may be appropriate "when the defendant misleads [the plaintiff] into allowing the statutory period to lapse, when [the plaintiff] has no reasonable way of discovering the wrong perpetrated against her, or when she timely files a technically deficient pleading and in all other respects acts with 'the proper diligence . . . which . . . statutes of limitation were intended to insure." *Id.* (quoting *Burnett*, 380 U.S. at 430, 85 S.Ct. 1050) (citations omitted). But, equitable tolling is inappropriate "when the plaintiff does not file her action in a timely fashion despite knowing or being in a position reasonably to know that the limitations period is running and, of course, when she fails to act with due diligence." *Id.; Bost*, 372 F.3d at 1242 (equitable tolling not available when a plaintiff did not file an action

promptly or failed to act with due diligence).

Finally, it bears noting that "due diligence on the part of the plaintiff, though necessary, is not sufficient in and of itself to prevail on the issue of equitable tolling." *Justice,* 6 F.3d at 1479. Rather, the Eleventh Circuit has generally required that the defendant engage in "some affirmative misconduct, such as deliberate concealment." *Cabello v. Fernandez–Larios,* 402 F.3d 1148, 1155 (11th Cir.2005).

 The Court concludes that no genuine issue of material fact exists as to whether equitable tolling is warranted in this case. As such, summary judgment in favor of Defendant is appropriate. As the Eleventh Circuit has repeatedly made clear, equitable tolling is inappropriate where the plaintiff either fails to file her action in a timely manner despite being in a position reasonably to know of her claim or fails to exercise due diligence. *Bost,* 372 F.3d at 1242; *Justice,* 6 F.3d at 1479. As discussed above, Plaintiff should have known both of his injury and its cause as late as the July 10, 2001 indictment. Yet, for whatever reason, Plaintiff failed to timely file his claim. Therefore, Plaintiff's claim falls squarely within those cases which hold equitable tolling to be unavailable. Furthermore, based on the Court's conclusion that, as of the time of Defendant's indictment in open court Plaintiff was in possession of facts sufficient to start the statute of limitations clock, Plaintiff's claim that equitable tolling is appropriate because Defendant took affirmative steps to conceal his involvement are unpersuasive. Whatever Defendant may have done to conceal his participation in the leak, and thereby preclude Plaintiff from the knowledge that he was responsible for his injury, his involvement was revealed upon his indictment. It was at that point the two-year limitation period began to run

and it is that limitation period that Plaintiff failed to meet.

Finally, in light of the well-established Eleventh Circuit precedent governing the availability and application of equitable tolling, the Court finds Plaintiff's reliance on numerous non-binding authorities to be unpersuasive. Furthermore, to the extent Plaintiff relies on *Omar ex rel. Cannon v. Lindsey,* 334 F.3d 1246 (11th Cir.2003), that reliance is misplaced. In that case, the Court of Appeals found dismissal under Rule 12(b)(6) inappropriate where "[b]oth parties set forth fact-intensive reasons why the motion to dismiss on the basis of the statute of limitations should be granted or denied." *Id.* at 1251–52. Based on this factual dispute, the Court of Appeals concluded that "the statute of limitations issue cannot be resolved at this stage of the litigation because such resolution would depend either on facts not yet in evidence or on construing factual ambiguities in the complaint in Defendants' favor, which would be inappropriate." *Id.* at 1252. No such situation is present here. Sufficient evidence has been presented for the Court to resolve the statute of limitations issue and Plaintiff has failed to establish that equitable tolling is warranted. Therefore, nothing in *Omar* precludes a determination that equitable tolling was not appropriate in this case.

The Court concludes that Plaintiff is not entitled to the benefits of equitable tolling. As such, Plaintiff's claims are barred by the two-year statute of limitations and Defendant is entitled to summary judgment.

### Conclusion

Based on the foregoing, the Court concludes that Plaintiff's action is barred by the statute of limitations. As such, Defendant's Motion to Dismiss [13], as converted to a Motion for Summary Judgment by Order of this Court [23], is hereby **GRANTED;** Plaintiff's Motion to File Ov-

ersize Opposition [14] is hereby **GRANTED** nunc pro tunc; and Plaintiff's Motion for Extension of Time [18] is hereby **GRANTED** nunc pro tunc.

**SO ORDERED** this *30th* day of September, 2005.